## Duggan *v.* Guild Theatre, Inc. et al., Appellants.

Argued October 1, 1969. Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

*Hubert I. Teitelbaum*, with him *Martin M. Sheinman, Sidney Silverblatt*, and *Edmund C. Grainger*, of the New York Bar, and *Morris, Safier & Teitelbaum*, for appellants.

*Carol Mary Los*, Assistant District Attorney, with her *Charles B. Watkins*, Assistant District Attorney, and *Robert W. Duggan*, District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE ROBERTS, November 11, 1969:

In *Commonwealth v. Guild Theatre, Inc.*, 432 Pa. 378, 248 A. 2d 45 (1968), we vacated a preliminary injunction which had barred the showing of the film "Therese and Isabelle" in Allegheny County. The case then went to trial and the chancellor, aided by an "advisory jury," held the movie obscene and issued a permanent injunction. This appeal followed. Appellants assign two principal grounds for reversal: that the district attorney could not proceed in this case by means

of an injunction; and that "Therese and Isabelle" is not constitutionally obscene. We hold that while the district attorney may seek to enjoin the showing of an obscene movie, "Therese and Isabelle" is not obscene. Accordingly, we reverse and vacate the decree granting the injunction.

Appellants' first contention, that the district attorney has no standing[1] to seek an injunction here, is based on the Act of July 31, 1968, P. L. , 18 P.S. §4524 (Supp. 1969). Section 4 of that act repealed the Act of September 17, 1959, P. L. 902, 4 P.S. §70.10, which had given the Board of Censors standing to seek an injunction against obscene movies. The 1968 act did not, however, repeal the statute which makes criminal the showing of an obscene movie. See Act of June 24, 1939, P. L. 872, §528, as amended, 18 P.S. §4528. The act did consolidate various statutes dealing with sale and distribution of obscene works to adults and minors. In section 1(b), which sets out separate provisions relating only to minors, the act specifically mentions sound recordings, sculpture, and motion pictures,

---

[1] We are not here involved with the question of whether equity has jurisdiction to entertain this proceeding. Jurisdiction is conferred by the Act of June 16, 1836, P. L. 784, §13, 17 P.S. §282, and the Act of February 14, 1857, P. L. 39, §1, 17 P.S. §283. They provide that common pleas has jurisdiction relating to "[t]he prevention or restraint of the commission or continuance of acts contrary to law and prejudicial to the interests of the community or the rights of individuals." Although Section 1(g) of the Act of July 31, 1968, P. L. , 18 P.S. §4524 (Supp. 1969) does specifically confer jurisdiction for injunctions against designated media other than movies, there is no reason to assume that the Legislature is required to specifically enumerate each type of case in which equity may act. The Legislature did not specifically confer equity jurisdiction in the now repealed statute giving the Board of Censors standing to seek injunctions against obscene movies. See Act of September 17, 1959, P. L. 902, 4 P.S. §70.10. It is enough that the Legislature has passed the general statute, supra.

none of which media are mentioned in section 1(a) which deals with adults. Section 1(g), which gives the district attorney standing to seek an injunction, only enumerates the media mentioned in section 1(a). Thus appellants argue, quite persuasively, that since the Legislature failed to use the term "motion pictures" in 1(g), a term used elsewhere in the statute, the district attorney has no power to seek an injunction under the statute.[2]

We agree that his authority cannot be derived from that statute. But that does not mean he lacks standing to institute an equitable proceeding here, for we cannot say that the Legislature was required to statutorily create standing to enable the district attorney to seek an injunction against an obscene movie. Obscenity is a public evil, long recognized in this Commonwealth to result in a particular type of public harm. See *Commonwealth v. Sharpless*, 2 Sergeant & Rawle (Pa.) 91 (1815). Where, as here, the district attorney is seeking to protect the public from a continuing dissemination of an allegedly obscene work, we cannot say that he lacks standing to vindicate this public right in a court of equity.[3]

---

[2] The district attorney concedes in his brief that motion pictures, generally, are not covered by 1(g). He argues that since "printed matter" and "photographs" are mentioned, and since this movie has subtitles, "Therese and Isabelle" may be reached under the statute. Such a construction would, of course, lead to the absurd conclusion that the Legislature intended that only foreign-language, nondubbed, movies are enjoinable.

[3] We do not pass on any procedural problems which may arise when a district attorney seeks an injunction, since such problems are no longer involved in this litigation. See *Commonwealth v. Guild Theatre*, 432 Pa. 378, 248 A. 2d 45 (1968). Compare *Grove Press, Inc. v. City of Philadelphia* (3d Cir.) (filed November 3, 1969) (holding unconstitutional the use of Pennsylvania's *preliminary* injunctive process against an allegedly obscene movie, since the preliminary process " 'fails to provide adequate safeguards

Since the district attorney does have standing to initiate an injunctive proceeding against an allegedly obscene movie, we must now consider the question of whether "Therese and Isabelle" is obscene. The last opinion in which we dealt at length with the problem of what constitutes obscenity in the constitutional sense is *Commonwealth v. Dell Publications, Inc.*, 427 Pa. 189, 233 A. 2d 840 (1967), cert. denied, 390 U.S. 948, 88 S. Ct. 1038 (1968). Although it is not now necessary to repeat all we said in that opinion, three propositions stand out.

The first is that this Court must make "an independent constitutional judgment on the facts of the case as to whether the material involved is constitutionally protected." *Jacobellis v. Ohio*, 378 U.S. 184, 190, 84 S. Ct. 1676, 1679 (1964). The second proposition is that "the evidence must be viewed in a light favorable to the . . . [work's] circulation." *Dell Publications*, 427 Pa. at 196, 233 A. 2d at 844 (citing *Roth v. United States*, 354 U.S. 476, 77 S. Ct. 1304 (1957), and *Memoirs v. Massachusetts*, 383 U.S. 413, 86 S. Ct. 975 (1966)). The third proposition is that to find obscenity, "three elements must coalesce: it must be established that (a) the dominant theme of the material taken as a whole appeals to a prurient interest in sex; (b) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and (c) the material is utterly without redeeming social value." *Memoirs v. Massachusetts*, 383 U.S. at 418, 86 S. Ct. at 977.

---

against undue inhibition of protected expression' "). Nor do we pass on the propriety of empaneling an "advisory" jury, or on the propriety of submitting to that jury difficult questions of constitutional law.

There are no United States Supreme Court decisions since *Dell Publications* which would lead us to a different view of what constitutes obscenity. The district attorney, however, argues that for two reasons we should depart from the propositions set out in *Jacobellis* and *Memoirs,* and relied on in *Dell Publications.* For one, the instant case is a proceeding in equity, rather than a criminal proceeding as in *Jacobellis,* supra. Therefore, it is argued, our standard of review should, for some reason, be different. This argument overlooks the fact that the *Jacobellis* standard of review was adopted because First Amendment guarantees were involved, and not because the proceedings were criminal. See *Jacobellis,* 378 U.S. at 189, 84 S. Ct. at 1679. This being a federal constitutional standard, we may not depart from it. We thus may not constitutionally overrule this part of our decision in *Dell Publications,* a case which involved an equity proceeding.

The district attorney next urges that a different standard for determining obscenity should be used when dealing with motion pictures. He argues that a motion picture reproduces actual conduct through sight and sound and, therefore, the impact on the viewer is far more vivid. Presumably the district attorney is arguing that if the medium can portray what is alleged to be obscene with greater impact, the medium itself is deserving of less constitutional protection. We cannot accept this argument, for the First Amendment permits no such limitation on its protection of free expression.

This is so for at least two reasons. First, as a factual matter, we cannot say that the impact of an obscene work will always be greater when put on film. Each medium has a different type of impact, one which is difficult to quantify on any sort of obscenity scale. A nude figure seen on the screen for a short time may

very well have less impact than a nude figure in a magazine, which can be leered at leisurely. Since we cannot say that the medium of motion pictures will inevitably render a work more obscene, we are constitutionally precluded from adopting a less protective constitutional standard.

Second, we find no indication in any United States Supreme Court decision that movies are to be treated differently than any other medium. As Judge FRIEND- LY has recently pointed out, "*Jacobellis* related to a film and neither the majority nor the dissenting opinions suggested that any stricter standard would apply." *United States v. A Motion Picture Film Entitled "I Am Curious-Yellow"*, 404 F. 2d 196, 201 (2d Cir. 1968) (concurring opinion). *Landau v. Fording*, 54 Cal. Rptr. 177 (Ct. App. 1966), aff'd, 388 U.S. 456, 87 S. Ct. 2109 (1967), does not support the district attorney's position. Although the lower court's opinion in that case does indicate the possibility of a different test for movies, and the United States Supreme Court did affirm five to four, the affirmance was without opinion. The conclusion that the Supreme Court approved this different test cannot be drawn from such silence, particularly since there was evidence of pandering and because the movie itself was classified by the lower court as being "hard-core pornography."[4] We agree with Judge FRIENDLY that the per curiam affirmance "affords too frail a foundation" to support a different test for movies. *I Am Curious-Yellow*, 404 F. 2d at 201.

Since our decision in *Dell Publications* is still constitutionally controlling, we must now apply it to the facts of this case.

---

[4] The movie was thirty minutes long and depicted "acts of male masturbation, fellatio, oral copulation, voyeurism, nudity, sadism and sodomy without any clear reference or relation to a dominant theme." *Landau*, supra at 181.

The chancellor found that the dominant theme of the material taken as a whole appeals to a prurient interest in sex. The district attorney urges that no evidence other than the film need be introduced to prove violation of this standard, since "[t]his area is one where a judge's subjective reaction is most relevant." *Dell Publications,* 427 Pa. at 201, 233 A. 2d at 847. That may be so where all agree that the "dominant theme of the work as a whole" is sex, leaving only the question of whether this theme appeals to a *prurient* interest in sex. But we could obviously not rely on a trial judge's "subjective reaction" to "King Lear," for example, since its dominant theme has nothing to do with sex. Compare *I am Curious-Yellow,* 404 F. 2d at 199 (holding picture not obscene; whatever the dominant theme may be, "it is certainly not sex"). Here there was considerable testimony that the dominant theme was not sexual. Thus, unlike our task in "Candy" where the theme was quite clear, we must make our own "independent constitutional judgment" as to whether the dominant theme is sexual.

It would appear from testimony given by witnesses for both sides that the dominant theme of the work is that of loneliness, the loneliness of a young girl, not wanted by her mother, who turns to another young girl for affection.[5] As a result of this lack of ma-

---

[5] Marie Torre, a witness for the district attorney who is a reporter for a Pittsburgh television station, testified: "Well, the plot is really a very simple one and it didn't require a good deal of imagination to come up with a plot of this kind. It's two girls, two Lesbians. . . . Lesbianism being an abnormal thing, you would have to, of course, give a little bit of background as to why the girl turned out this way. So in this case, she was not wanted by her mother—at least this was the theme they tried to project— that she was hungry for love and turned to someone who would give it, and it happened to be another girl."

Dr. Otto Von Mering, a witness for the defense who is a Professor of Anthropology, School of Medicine, Department of Psy-

ternal affection, the movie tells us, the girl becomes entwined in a homosexual relationship. Does this then make the dominant theme of the work as a whole a sexual one? Taking the evidence in a light favorable to the movie's dissemination, as we must, we cannot say that it does.[6]

Even if the dominant theme were one of homosexual love, we would still be unable to say that its appeal was to a prurient interest in sex. As the United States Supreme Court has stated, even when a motion picture "portrays a relationship which is contrary to the moral standards, the religious precepts, and the legal code of its citizenry," the constitution nevertheless protects such ideas. *Kingsley International Pictures Corp. v. Regents,* 360 U.S. 684, 688, 79 S. Ct. 1362, 1365 (1959) (holding not obscene the motion picture version of "Lady Chatterly's Lover"). A movie which tells a story of homosexual love is one which, some years ago, may have appealed to a viewer's prurient interest in sex. But we cannot say today, in an era of "Myra Breckenridge" and "The Fox," that this theme has such an appeal. Compare *I. M. Amusement Corp. v. Ohio,* 389 U.S. 573, 88 S. Ct. 690 (1968) (holding not obscene a movie involving "moving pinups" and a nude lesbian love scene). Clearly, it is the standard of to-

chiatry at the University of Pittsburgh, put it perhaps a bit more elegantly: "[T]he basic theme is the classic one of the adolescent, namely, of loneliness and not knowing sometime to whom you should turn, and even deeper than that. Perhaps the problem is dealing with the theme of mistrust: how do I come to trust another person? And, in a way, the experience of this person was an episode in the search for trust in other people."

[6] Mr. Clancy, an attorney for Citizens for Decent Literature, testified for the district attorney that about a total of sixteen minutes out of the two-hour film, and five scenes out of thirty, dealt with sexual activity. This further reinforces our view that the dominant theme of the film is not sexual. Compare *Landau v. Fording,* supra note 4.

day by which we must judge. See *Dell Publications*, 427 Pa. at 202, 233 A. 2d at 847 (citing *Jacobellis*, supra, and *Smith v. California*, 361 U.S. 147, 160, 169, 80 S. Ct. 215, 222, 227 (1959)).

Nor has the district attorney proved that this movie "affronts contemporary community standards" relating to the representation of sexual matters. Each one of his witnesses called to testify as to contemporary community standards admitted that they had no idea what these standards were. The district attorney in his brief admits that he produced no expert testimony on this issue, yet urges us to find that the movie affronts contemporary standards. This we cannot do. Courts of law are not capable of deciding what contemporary standards are, without the benefit of any evidence whatsoever.[7] Cf. *Dell Publications*, 427 Pa. at 193, 233 A. 2d at 843.

As for the third independent test, the district attorney has not proved "Therese and Isabelle" to be utterly without redeeming social value. One of his witnesses, after stating that the movie was "practically devoid" of social value, admitted he did not even know what the term means. Another one of his witnesses felt that works declared not obscene in twenty-two recent United States Supreme Court decisions were utterly without redeeming social value. As for "Therese and Isabelle," he believed only that a jury *could* find it utterly without social value.

The defense witnesses, on the other hand, were able to demonstrate that the film did have redeeming social value. For example, one witness, a former New York

---

[7] The appellants offered to introduce evidence at trial that "Therese and Isabelle" had played at 386, out of 800, first-run movie theaters in the country. The chancellor, although realizing that community standards must be judged nationally, refused to admit this evidence. Such a ruling is clear error.

State film censor, testified that the movie "points up the destructive effect that the lack of parental love has on a young person. It shows how young people caught in this kind of situation can very easily, in their search for affection or love, become involved in this kind of exploratory or transitory homosexual relationship." Another witness, who was chairman of this Commonwealth's Board of Censors before it was disbanded, felt that the effects of maternal rejection shown in the movie were a lesson for parents. Compare *Robert-Arthur Management Corp. v. Tennessee*, 389 U.S. 578, 88 S. Ct. 691 (1968) (holding not obscene a movie which informs people that "sexual filth" exists in the world). We can hardly say that such testimony is merely a "spurious claim for litigation purposes," as the district attorney urges, particularly since it conforms to the plot of the movie. There is obviously some social value in presenting these ideas, even if we dislike the message, or think it is incorrect, or even think it is not presented as convincingly as possible.

Thus the Commonwealth has not shown, under any one of the three independent standards set forth in *Memoirs* and *Dell Publications*, that "Therese and Isabelle" is constitutionally obscene. We also note that none of the circumstances identified in *Redrup v. New York*, 386 U.S. 767, 768, 87 S. Ct. 1414, 1415 (1967), are present in this case. The injunction does not reflect "a specific and limited state concern for juveniles," there was no evidence of an assault upon individual privacy in a manner so obtrusive as to make it impossible to avoid exposure, and there was no evidence of "pandering."

We must, therefore, hold that "Therese and Isabelle" may not constitutionally be banned. Accordingly, the decree restraining the exhibition of the movie is vacated and the case is dismissed.

Mr. Justice EAGEN and Mr. Justice POMEROY concur in the result.

---

OPINION BY MR. JUSTICE COHEN:

The opinion of Mr. Justice ROBERTS makes no mention of the unusual procedure employed by appellee. He originally filed a complaint in equity at No. 888 October Term, 1968D on July 19, 1968. That action was the subject of this Court's opinion in *Commonwealth v. Guild Theatre, Inc.*, 432 Pa. 378, 248 A. 2d 45 (1968) in which we vacated the injunction for two reasons: (a) a hearing without notice and (b) censorship without provision for a prompt judicial decision. That decision was filed on November 12, 1968.

Instead of proceeding further with that action, appellee, on November 25, 1968, filed another complaint in equity at No. 2692 January Term, 1969. Apparently he did this because he did not want to continue with an action once tainted by unconstitutional procedures. In preliminary objections to the second complaint, appellant argued that there was pending a prior action, 12 P.S. App. R.C.P. 1509, 1017(b)(5), and that the second action should be stayed or dismissed because the relief sought and the parties involved in both actions were identical. *Dickerson v. Dickerson Overseas Company*, 369 Pa. 244, 85 A. 2d 102 (1952); *Tamburrino v. The Pennsylvania Railroad Co.*, 17 Pa. D. & C. 2d 156 (1958); 4 Standard Pennsylvania Practice, Ch. 13, §26.

In its opinion, the lower court "overruled the objection based on the pendency of a prior action because the District Attorney stated for the record that the prior action was abandoned and discontinued." Any abandonment and discontinuance was without notice to or the consent of appellant. In view of this unusual method of proceeding, I would vacate the decree on

the ground of *lis pendens* and not reach the other issues raised here.

Mr. Justice JONES joins in this opinion.

---

DISSENTING OPINION BY MR. CHIEF JUSTICE BELL:

For the reasons set forth in my dissenting Opinion in *Commonwealth v. Dell Publications, Inc.,* 427 Pa. 189 (pages 221-223), 233 A. 2d 840, and my dissenting Opinion in *Commonwealth v. Baer,* 436 Pa. 18, 257 A. 2d 254, this is an obscene movie, and I dissent.