Chalk Appeal.

Argued May 25, 1970. Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

*Daniel H. Shertzer,* for appellant.

*Sidney V. Blecker,* Assistant Attorney General, with him *Edward Friedman,* Counsel General, and *William C. Sennett,* Attorney General, for Pennsylvania State Civil Service Commission, appellee.

OPINION BY MR. JUSTICE ROBERTS, January 7, 1971:

This is an appeal from a decision of the State Civil Service Commission, suspending appellant, who is a public assistance caseworker, for ten days without pay. The Commission, by a two-to-one vote, found that certain remarks made by appellant at a public meeting of a group called the "Public Assistance Committee" vio-

lated two sections of the Department of Public Assistance Bulletin 659. These sections provide that employees of the Department should "conduct themselves in a manner that will bring credit to the Commonwealth," and should "never . . . engage in any activity which would cause embarrassment or merit unfavorable publicity to the Department or the Commonwealth". The remarks made by appellant, the Commission found, "were critical of personnel and policies of the public assistance administration of the York County Board". The dissenting Commissioner noted that "appellant urged public assistance recipients to get on caseworkers' backs and demand their rights; he stated some caseworkers failed to accord recipients dignity and inform them of their rights of appeal and . . . he exhorted recipients, quoting Frederick Douglass, to 'agitate, agitate, agitate.' "[1]

Following the Commission's decision, appellant prosecuted this appeal. He urges that his speech was constitutionally protected by virtue of the First and Fourteenth Amendments to the United States Constitution, and Article I, Section 7, of the Pennsylvania Constitution, and hence that his suspension was improper. We agree.[2]

[1]We also note that the meeting was held after regular working hours, and that appellant specifically appeared as a private individual. Before the meeting, however, appellant was informed that Bulletin 659 would govern his conduct at the meeting.

[2]In view of our decision today that appellant's speech is constitutionally protected, we do not pass on his other claim that the regulation is void for vagueness. See, e.g., *Baggett v. Bullitt*, 377 U.S. 360, 372, 84 S. Ct. 1316, 1322-23 (1964) ; *N.A.A.C.P. v. Button*, 371 U.S. 415, 432, 83 S. Ct. 328, 337 (1963) (citing cases) ; *Cramp v. Board of Education*, 368 U.S. 278, 287, 82 S. Ct. 275, 281 (1961) ; *Lanzetta v. New Jersey*, 306 U.S. 451, 59 S. Ct. 618 (1939) ; Amsterdam, The Void-For-Vagueness Doctrine in the Supreme Court, 109 U. Pa. L. Rev. 67, 75-77 (1960). But see *Meehan v. Macy*, 392 F. 2d 822 (D.C. Cir. 1968).

There can be no doubt of "[t]he general proposition that freedom of expression upon public questions is secured by the First Amendment . . . ." *New York Times Co. v. Sullivan,* 376 U.S. 254, 269, 84 S. Ct. 710, 720 (1964). It has long been recognized that "[t]he maintenance of the opportunity for free political discussion to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means . . . is a fundamental principle of our constitutional system". *Stromberg v. California,* 283 U.S. 359, 369, 51 S. Ct. 532, 536 (1931). The importance of the First Amendment was perhaps most eloquently stated by Mr. Justice BRANDEIS: "Those who won our independence believed that . . . the greatest menace to freedom is an inert people; that public discussion is a political duty; and that this should be a fundamental principle of the American government. . . . [T]hey knew that order cannot be secured merely through fear of punishment for its infraction; that it is hazardous to discourage thought, hope and imagination; that fear breeds repression; that repression breeds hate; that hate menaces stable government; that the path of safety lies in the opportunity to discuss freely supposed grievances and proposed remedies; and that the fitting remedy for evil counsels is good ones. Believing in the power of reason as applied through public discussion, they eschewed silence coerced by law —the argument of force in its worst form. Recognizing the occasional tyrannies of governing majorities, they amended the Constitution so that free speech and assembly should be guaranteed." *Whitney v. California,* 274 U.S. 357, 375-76, 47 S. Ct. 641, 648 (1927) (concurring opinion) (footnote omitted).

In the face of this authority the Commission places a famous statement of Mr. Justice HOLMES: "The petitioner may have a constitutional right to talk politics, but he has no constitutional right to be a policeman."

*McAuliffe v. Mayor of New Bedford*, 155 Mass. 216, 220, 29 N.E. 517, 517-18 (1892). This statement, urges the Commission in its brief, "represents the fundamental rule of constitutional law in this area". We cannot agree.

As Mr. Justice HOLMES himself once observed: "It is one of the misfortunes of the law that ideas become encysted in phrases and thereafter for a long time cease to provoke further analysis". *Hyde v. United States*, 225 U.S. 347, 391, 32 S. Ct. 793, 811 (1912) (dissenting opinion). In line with this admonition, we must recognize that Mr. Justice HOLMES' statement is from a past century, predating the tremendous increase in government activity and employment. See Van Alstyne, The Demise of the Right-Privilege Distinction, 81 Harv. L. Rev. 1439, 1461-62 (1968). In accord with these changes, it is today a well established principle that constitutional rights are no longer forfeited simply because one is a policeman, see *Garrity v. New Jersey*, 385 U.S. 493, 87 S. Ct. 616 (1967); *Wood v. Georgia*, 370 U.S. 375, 82 S. Ct. 1364 (1962); *Muller v. Conlisk*, 429 F. 2d 901 (7th Cir. 1970); or a lawyer, see *Spevack v. Klein*, 385 U.S. 511, 87 S. Ct. 625 (1967); or a teacher, see *Pickering v. Board of Education*, 391 U.S. 563, 88 S. Ct. 1731 (1968); *Keyishian v. Board of Regents*, 385 U.S. 589, 87 S. Ct. 675 (1967); *Slochower v. Board of Education*, 350 U.S. 551, 76 S. Ct. 637 (1956); or even a lifeguard, see *Donovan v. Mobley*, 291 F. Supp. 930 (C.D. Cal. 1968).

These public occupations "are not relegated to a watered-down version of constitutional rights". *Garrity v. New Jersey*, 385 U.S. at 500, 87 S. Ct. at 620. In reply to the premise underlying Mr. Justice HOLMES' statement, the United States Supreme Court has noted: "It is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege".

*Sherbert v. Werner,* 374 U.S. 398, 404, 83 S. Ct. 1790, 1794 (1963). See generally Note, Another Look at, Unconstitutional Conditions, 117 U. Pa. L. Rev. 144 (1968). Indeed, as the United States Supreme Court has unequivocally stated, " 'the theory that public employment which may be denied altogether may be subjected to any conditions, regardless of how unreasonable, has been uniformly rejected'." *Keyishian v. Board of Regents,* 385 U.S. at 605-606, 87 S. Ct. at 685.[3]

It is of course true that the State does have a greater interest in the utterances of its employees than it has in those of its citizenry in general. Recognizing this, the United States Supreme Court has set out the standards which must now guide us in this sensitive area: "The problem in any case is to arrive at a balance between the interests of the . . . [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Education,* 391 U.S. at 568, 88 S. Ct. at 1734-35.[4]

---

[3]The Commission in its brief, relies heavily on *Adler v. Board of Education,* 342 U.S. 485, 492, 72 S. Ct. 380, 385 (1952). But the Court in *Keyishian,* supra, after quoting the passage from *Adler* upon which the Commission relies, specifically repudiates *Adler.* See *Keyishian,* 385 U.S. at 605-606, 87 S. Ct. at 685. And in *Meehan v. Macy,* 392 F. 2d 822, 832 (D.C. Cir. 1968)—another case upon which the Commission relies—Judge LEVENTHAL noted for the court: "Whatever liberties a private employer might have or take, the Government cannot disregard the Bill of Rights merely by calling on its prerogative to hire and fire employees. The Constitutional climate of today is different from that of 1892 when Justice Holmes struck off his oft-quoted phrase."

[4]It should be noted that while the *Pickering* decision set out these standards, the foundation of the opinion was the infringement of the public employee's (a teacher) First Amendment rights. As Mr. Justice MARSHALL, speaking for eight members of the Court, stressed at the outset of the majority opinion: "To the extent that the Illinois Supreme Court's opinion may be read to suggest that

Applying this test to the instant case, we cannot say that the Commission has weighed the balance properly.

While the Commission found that "the remarks of appellant were detrimental to the public assistance administration in York County", the Commission has given us no indication of how this finding was arrived at. Nor does our independent review of the record[5] disclose any. The appointing authority, as the dissenting Commissioner noted, did not produce any evidence of the harmful effects of the speech, compare *Pickering,* 391 U.S. at 570, 88 S. Ct. at 1736. Indeed, as the Commission stated, six witnesses testified that appellant's remarks "were beneficial to those present". Nor has the appointing authority shown, for example, that appellant's remarks were defamatory, see *Meehan v. Macy,* 392 F. 2d 822 (D.C. Cir. 1968); cf. *New York Times v. Sullivan,* supra; or that his conduct in his job was

---

teachers may *constitutionally be compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens* to comment on matters of public interest in connection with the operation of the public schools in which they work, it proceeds on a premise that has been *unequivocally rejected in numerous prior decisions* of this Court." 391 U.S. at 568, 88 S. Ct. at 1734 (citations omitted) (emphasis added). Our view that *Pickering* is based upon the First Amendment finds support in a recent opinion by the Court of Appeals for the Seventh Circuit: "In Pickering v. Board of Education, 391 U.S. 563, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968), the Court dealt with the *First Amendment right* of public employees to speak on matters of public concern relating to their employment and with the right of the state, as an employer, to regulate the exercise of such right." *Muller v. Conlisk,* 429 F. 2d 901 (7th Cir. 1970) (emphasis added) (holding police department regulation of internal criticism void).

[5]"This Court has regularly held that where constitutional rights are in issue an independent examination of the record will be made in order that the controlling legal principles may be applied to the actual facts of the case." *Pickering v. Board of Education,* 391 U.S. at 578 n. 2, 88 S. Ct. at 1740 n. 2 (citing cases). See also *Duggan v. Guild Theatre, Inc.,* 436 Pa. 191, 196, 258 A. 2d 858, 861 (1969).

so antagonistic as to amount to borderline insubordination, see *Lefcourt v. Legal Aid Society,* 312 F. Supp. 1105 (S.D.N.Y. 1970).

In sum, the York County Board has not shown that its interest in limiting appellant's opportunity "to contribute to public debate" is "significantly greater than its interest in limiting a similar contribution by any member of the general public". *Pickering,* 391 U.S. at 573, 88 S. Ct. at 1737. Appellant's remarks were a criticism of how a governmental institution was functioning. Indeed, as a member of that institution, he had a unique, and valuable, perspective from which to view it. Whether his statements were true, or false, need not concern us, for this is a question which could not meaningfully be answered by either the York County Board, or the Civil Service Commission.[6] Appellant was addressing himself to matters of public policy, where "the best test of truth is the power of the thought to get itself accepted in the competition of the market". *Abrams v. United States,* 250 U.S. 616, 630, 40 S. Ct. 17, 22 (1919) (HOLMES, J., dissenting). His statements may have been upsetting,[7] but the Commission could

---

[6]"More importantly, the question whether a school system requires additional funds is a matter of legitimate public concern on which the judgment of the school administration, including the School Board, cannot, in a society that leaves such questions to popular vote, be taken as conclusive. On such a question free and open debate is vital to informed decision-making by the electorate. Teachers are, as a class, the members of a community most likely to have informed and definite opinions as to how funds allotted to the operation of the schools should be spent. Accordingly, it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal." *Pickering,* 391 U.S. at 571-72, 88 S. Ct. at 1736.

[7]We note that the criticisms which appellant leveled at the welfare system were similar to what many others were saying at the time. A partial list of articles appearing in national magazines at approximately the time appellant made his remarks (July 27, 1967), and which concern themselves either with the growing

not, without more, suspend him from his job for uttering them.

The order of the Civil Service Commission is reversed.

Mr. Justice POMEROY concurs in the result.

Mr. Justice EAGEN dissents.

Mr. Justice COHEN took no part in the decision of this case.

---

DISSENTING OPINION BY MR. CHIEF JUSTICE BELL:

I vigorously dissent. The Majority stretch the Constitutional right of "freedom of speech" to a point where a Governmental employee, by his public attacks, may hold his Department up to such public ridicule and contempt as to jeopardize its efficient administration, and indeed its very existence. Both our Court and the Supreme Court of the United States have often said that "freedom of speech" is not absolute or unlimited. *Gitlow v. New York,* 268 U.S. 652; *Brandenburg v. Ohio,* 395 U.S. 444; *Andress v. Zoning Board of Adjust,* 410 Pa. 77, 188 A. 2d 709; *Taylor and Selby Appeals,* 412 Pa. 32, 193 A. 2d 181, and a dozen cases cited therein.

---

trend of welfare recipients to press their rights, or the inhumanity of the welfare system, includes: Cloward & Piven, "A Strategy to End Poverty", 202 The Nation 510 (May 2, 1966) (advocates adding people to welfare rolls and insisting on all their statutory rights) ; Silver, "Poverty As A Crime", 86 Commonweal 74 (1966) ("Rarely are the rights of the poor publicly known.") ; "Poverty: The Welfare Labyrinth, Newsweek, August 28, 1967, at 22-25; " 'Unions' For People on Relief", U. S. News & World Report, October 30, 1967 (discusses the rise of groups like the Welfare Rights Organization) ; Jacobs, "Getting on Welfare", Harper's Magazine, October 1967, at 74 ("[My interview] was conducted as if I were not a human being so much as a potential case number, to be processed under hundreds of regulations.") ; "Welfare and Illfare: The Alternatives to Poverty", Time Magazine, December 31, 1968, at 25-26.

The public exhortations of this Public Assistance Department employee urging public assistance recipients "to get on caseworkers' backs and demand their rights", and further exhorting them to "agitate, agitate, agitate", passes far beyond the protection of the First Amendment. If the Majority's "near-absolute freedom-of-speech approach" be carried to its logical conclusion, it could conceivably create such lack of public confidence in one or more Departments and such bitter resentments and divisions as to not only (I repeat) greatly impair the efficiency and existence of that Department (or Departments), but also could jeopardize the effective operation and functioning of our entire Government. An employee of the Commonwealth, working in a sensitive area of the business of his Governmental Department, is—and quite properly should be —subject to much greater restriction, in regard to (legislatively unsolicited) criticism of the Department which he purports to be serving, than a person who has no connection therewith. Cf. *Pickering v. Board of Education*, 391 U.S. 563. Indeed, even an ordinary business employee owes a certain amount of loyalty to his employer, and if the employee publicly attacks, ridicules or undermines his employer or his policies, he should be, and usually is, subject to dismissal or appropriate punishment.