American Federation of State, County and Municipal Employees *v.* Shapp et al., Appellants.

528

530

Argued May 25, 1971. Before BELL, C. J., JONES, EAGEN, O'BRIEN, ROBERTS, POMEROY and BARBIERI, JJ.

reargument refused August 16, 1971.

*Israel Packel,* Special Assistant Attorney General, with him *Peter W. Brown,* Deputy Attorney General, and *J. Shane Creamer,* Attorney General, for appellants.

*Gilbert A. Cornfield,* with him *Kleiman, Cornfield and Feldman, Pepper, Hamilton & Scheetz,* and *Wilderman, Markowitz & Kirschner,* for appellees.

OPINION BY MR. CHIEF JUSTICE BELL, June 24, 1971:

The plaintiffs in this case are (1) three individuals who at the time the action was brought were employees

of the Department of Transportation* of the Commonwealth of Pennsylvania (hereinafter referred to as D. O.T.), and (2) an AFL-CIO labor union which, although not formally certified as the collective bargaining agent, purports to represent in excess of 5,000 persons who are employed by D.O.T. but are not covered by Civil Service. The defendants are Milton Shapp, Governor of the Commonwealth of Pennsylvania, and Jacob Kassab, Secretary of Transportation of the Commonwealth, who was appointed to that office by Governor Shapp.

The plaintiffs, anticipating that they and many additional thousands of D.O.T. employees who had been appointed and employed by the State under the prior Administration were to be discharged (as they later were: see infra) because of their Republican political sponsorship or patronage, filed a complaint in the Commonwealth Court on *April 21,1971,* seeking an injunction against their discharge and other equitable relief. Simultaneously with the filing of the complaint, the plaintiffs filed a motion in the Commonwealth Court, asking for a special injunction to restrain mass firings by the Governor of D.O.T. employees solely for political reasons. Thereupon defendants filed preliminary objections in the form of a demurrer.

Plaintiffs' basic theory is that the employees in this Department, *even though admittedly appointed for political reasons,* should be entitled to notice and a hearing before discharge, and that political affiliation is not a proper or lawful basis or ground for discharge.

The Commonwealth Court heard argument on the motion for an injunction but refused to issue the injunction without an evidentiary hearing, which it listed for *May 10,* 1971. In the interim, some two thousand employees of D.O.T. (*including the three individual plaintiffs*) had been fired and replaced by other per-

---

* Formerly called the Highway Department.

sons. At the conclusion of the evidentiary hearing on the plaintiffs' complaint and on their motion or petition for an injunction, the Commonwealth Court set a further hearing date of *June 3,* 1971 to consider the defendants' aforesaid preliminary objections in the form of a demurrer, and also issued an Order to maintain the status quo pending that hearing. The Commonwealth Court's Order to maintain the status quo also provided (1) that there be no more terminations or discharges of non-policy-making employees in and from D.O.T. without notice and a hearing, and (2) that all such employees in that Department whose employment had been terminated since April 21, 1971 must be given an opportunity for rehiring if and when vacancies arise in the affected job classifications, prior to the disposition of this suit. This was in effect an Order granting a preliminary injunction.*

The first question raised in this appeal is whether the Commonwealth Court abused its discretion in issuing the aforesaid preliminary injunction.

Ordinarily, three prerequisites are essential to justify the issuance of a preliminary injunction. First, the issuance of the preliminary injunction is necessary to prevent immediate and irreparable harm which could not be compensated by damages; second, greater injury would result by refusing the preliminary injunction than by granting it; third, until a final determination can be made, the decree preserves the status quo and

---

*The original Order of the Commonwealth Court, which was issued May 11, 1971, did not provide for the posting of a bond. The following day, May 12, 1971, the Commonwealth Court amended its Order to require a bond in the amount of $50,000. In the meantime, defendants had filed an appeal with this Court. However, the writ of certiorari issued by this Court was not filed with the Commonwealth Court *until after* its original Order had been amended and the plaintiffs had filed the required bond. A special supersedeas was granted by this Court pending the disposition of this appeal.

the rights of the parties as they existed immediately prior to the allegedly wrongful conduct. *Alabama B. & C. Corp. v. Pa. Ind. Chem. Corp.,* 410 Pa. 214, 189 A. 2d 180.

Moreover, there must also be some apparently reasonable grounds, as well as pertinent legal principles, to support the preliminary injunction. In *Community S., Inc. v. Denver R. Rock., Inc.,* 429 Pa. 565, 240 A. 2d 832, the Court said (page 569) : "We start with the proposition, now firmly established, that 'on an appeal from a decree which refuses, grants or continues a preliminary injunction, we will look only to see if there were any apparently reasonable grounds for the action of the court below, and we will not further consider the merits of the case or pass upon the reasons for or against such action, unless it is plain that no such grounds existed or that the rules of law relied on are palpably wrong or clearly inapplicable: . . .' Lindenfelser v. Lindenfelser, 385 Pa. 342, 343-44, 123 A. 2d 626, 627 (1956) ; United Natural Gas Co. v. Wagner, 417 Pa. 456, 208 A. 2d 843 (1965) ; Alabama Binder & Chemical Corp. v. Pennsylvania Industrial Chemical Corp., 410 Pa. 214, 189 A. 2d 180 (1963)."

We believe the Order granting the plaintiffs a preliminary injunction was justified only if the Governor's actions were clearly in violation of plaintiffs' Constitutional or Statutory rights.

The basic issue boils down to this : Can the Governor of Pennsylvania discharge *at will* any and every employee of our State Government who is not protected from discharge (a) by the Constitutional provision of procedural Due Process, with a right to notice and a hearing, or (b) by any other provision of the Constitution, or (c) by any Federal Statute, including the Civil Rights Act and the Voting Rights Act, or (d) by any State Statute, including Civil Service Statutes and the Public Employe Relations Act?

Plaintiffs have been unable to establish a Constitutional right to their retention of a job obtained through the system of political patronage. Absent the establishment of such a Constitutional right, their claim of protection under procedural Due Process of a right to notice and a hearing is without merit. It has long been the established law, in both the Federal Courts and the Courts of our Commonwealth, that a public employer, including as such the Government, may summarily discharge a person in the employ of the Government, absent controlling legislation. In *Cafeteria Workers v. McElroy*, 367 U.S. 886, the Supreme Court said (pages 896-897) : "It has become a settled principle that government employment, in the absence of legislation, can be revoked at the will of the appointing officer. In the Matter of Hennen, 13 Pet. 230, 246, 259; Crenshaw v. United States, 134 U.S. 99, 108; Parsons v. United States, 167 U.S. 324, 331-334; Keim v. United States, 177 U.S. 290, 293-294; Taylor and Marshall v. Beckham (No. 1), 178 U.S. 548, 575-578. This principle was reaffirmed quite recently in Vitarelli v. Seaton, 359 U.S. 535. There we pointed out that Vitarelli, an Interior Department employee who had not qualifed for statutory protection under the Civil Service Act, 'could have been summarily discharged by the Secretary at any time without the giving of a reason. . .' . 359 U.S., at 539."

In *Scott v. Phila. Parking Auth.*, 402 Pa. 151, 166 A. 2d 278, our Court adopted the same philosophy as expressed in *Cafeteria Workers*. With regard to the summary removal of non-Civil Service employees, we said (page 154) : "Without more, an appointed public employee takes his job subject to the possibility of summary removal by the employing authority. *He is essentially an employee-at-will.*\* As we said in Mitchell v.

---

\* Italics throughout, ours.

Chester Housing Authority, 389 Pa. 314, 328, 132 A. 2d 873 (1957), with reference to a state agency employee but applicable in general, '. . . good administration requires that the personnel in charge of implementing the policies of an agency be responsible to, and responsive to those charged with the policy-making function, who in turn are responsible to a higher governmental authority, or to the public itself, whichever selected them. This chain of responsibility is the basic check on government possessed by the public at large.' The power to dismiss summarily is the assurance of such responsibility."

We specifically hold that State employees who obtained their positions (jobs)—*as all the parties agree they did*—by politics or party patronage, and complain of being fired solely on the grounds of political sponsorship or affiliation, have (1) no Constitutionally ordained right of procedural Due Process, (2) nor any other Constitutionally protected right to their jobs under (a) either the Federal or (b) the State Constitution, (3) nor any right claimed herein under any (a) Federal or (b) State Statute.

For example, the Voting Rights Act of 1965, as amended by the Voting Rights Act of 1970, 42 U.S.C. §1971, on which plaintiffs rely, was enacted to provide and make certain that all citizens of the United States, who are otherwise qualified by law to vote in any election, shall not be deprived of the right to vote as they may choose by reason of race or color, or by intimidation, threats or coercion.

The Civil Rights Act of 1871, 42 U.S.C. §1983, provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution

and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

Section 701 of the Pennsylvania Public Employe Relations Act of 1970, P. L. 563, No. 195, upon which plaintiffs likewise rely, pertinently provides: *"Collective bargaining* is the performance of the mutual obligation of the public employer and the representative of the public employes to meet at reasonable times and confer in good faith with respect to wages, hours and other terms and conditions of employment, or the negotiation of an agreement or any question arising thereunder . . . ."

It is clear that these plaintiffs do not come within the provisions or protection of any of the aforesaid Acts.

Regretfully for many of us, who believe that politics and political influence or patronage should be greatly limited and greatly reduced, and that able State employees, whose livelihood will be jeopardized, should not be discharged for political reasons, we are compelled to hold that the Governor of Pennsylvania has the power and authority to hire and fire *at will* any and all employees who are not Constitutionally or Statutorily protected—irrespective of their ability, their politics[*] or their political connections. Those who, figuratively speaking, live by the political sword must be prepared to die by the political sword.

Order reversed, each party to pay own costs.

Mr. Justice EAGEN and Mr. Justice ROBERTS concur in the result.

---

[*] Politics or political patronage is and always has been an important part and parcel of our Local, State and National Governments, and unless changed by the Legislature, will, we believe, undoubtedly continue to be a part of our Country's Governments—Local, State and National.

DISSENTING OPINION BY MR. JUSTICE BARBIERI:

I must respectfully dissent from the majority's conclusion that the preliminary injunction issued by the Commonwealth Court has no apparently reasonable grounds and must therefore be overturned. In so doing, the majority holds that any public employe, not statutorily protected from discharge at will, may be fired solely because of his political affiliation or sponsorship at the time he was hired.[1] I find this view unacceptable even aside from statutory considerations, for even if it were true that in these times a public employer may fire a person who does not have tenure or civil service status for no reason at all, it would not follow in my view that such a public employe could be fired for a wrong reason. And such a firing would be as unjustifiable to me whether it was based upon the nature of the "sponsorship" (the word used by defendants and the majority) or upon the affiliation of the employe at the time of hiring. I see no legal difference in the context of this case between "sponsorship" and "affiliation". If the nature of the employe's sponsorship at the time of hiring is a proper basis for firing, the broad scope of such a principle is obvious, for I can see no rational or logical basis for differentiating between sponsorship by a political party, such as in this case, and sponsorship by any other association which sponsors or aids in obtaining employment for unskilled workers such as those in this case. We are all aware that organizations, acting along racial and religious lines, exist and are uni-

---

[1]The majority states that the plaintiffs were "admittedly appointed for political reasons." I do not so read the stipulation which states, merely as to the employer's *reason* for the firing, that they "have been or will be terminated from their employment, because when they were hired they were sponsored for their employment by officials of the Republican Party. . . ." I believe that this leaves open a question of fact for hearing as to whether or not the sponsorship was for political reasons, even under the majority view.

versally supported in their efforts to obtain employment for their people. No one would say that such employes could be fired solely because the new employment authority was not of the same religious persuasion or color as that of the sponsoring entity. In short, I am unable to agree that political affiliation or sponsorship in this category of employes (those needing assistance to obtain employment) can be sensibly treated as discrediting or disqualifying any more than in the cases of hirings because of sponsorship by religious or racial groups. It goes without saying, of course, that an act of the Legislature would be deemed to be unconstitutional by every court in the land if it provided that public employes could be discharged solely because their sponsorship had been by racial or religious associations.

Quite aside from such logical and practical considerations, however, while the majority holding is based upon, and may be consonent with familiar concepts of patronage and the "spoils system", I think a new day has dawned for "non-policy making" public employes,[2] legislatively as well as constitutionally; and that the conclusion reached by the majority is in disregard of the plaintiff-employes' First Amendment right of freedom of association, circumvents the policy of the Public Employe Relations Act, Act of July 23, 1970, P. L. 563, No. 195, 43 P.S. §1101.101 et seq., and presents a claim cognizable under the Civil Rights Act of 1871, 42 USCA §1983. I disagree, of course, with the majority's conclusion that the employes in this case "are not constitutionally or statutorily protected".

The majority relies upon the decision in Cafeteria Workers v. McElroy, 367 U.S. 886, 6 L. ed. 2d 1230 (1960), for the proposition that a public employer may summarily dismiss a government employe, absent con-

---

[2] It is stipulated that the employes involved herein are in "non-policy making positions". Record 19a.

trolling legislation. That decision is inapposite here for several reasons. First, the case dealt with the revocation of an employe's identification badge, needed to gain admission to the defense facility involved, for security reasons. Next, the employe was not a public employe, but merely a person employed by a private concessionaire who was operating the cafeteria on the premises under a contract with the facility. Further, the contract between the government and the private employer permitted this kind of action by the facility superintendent and security officer. And finally, the majority opinion clearly provides, in language more appropriate to this case, as follows: "Those cases [United Public Workers v. Mitchell, 330 U.S. 75 and Wieman v. Updegraff, 344 U.S. 183] demonstrate only that the state and federal governments, even in the exercise of their internal operations, do not constitutionally have the complete freedom of action enjoyed by a private employer. But to acknowledge that there exist constitutional restraints upon state and federal governments in dealing with their employes is not to say that all such employes have a constitutional right to notice and a hearing before they can be removed. We may assume that Rachel Brawner [the discharged employe] could not constitutionally have been excluded from the Gun Factory *if the announced grounds for her exclusion had been patently arbitrary or discriminatory—that she could not have been kept out because she was a Democrat or a Methodist.*" 367 U.S. at 897-98, 6 L. ed. 2d at 1238. (Emphasis supplied.)

In spite of the above language, the majority of our Court now countenances precisely what the United States Supreme Court has declared to be unconstitutional. It is true that no case has ever decided that the "spoils system" is unconstitutional, but the clear implication of many United States Supreme Court decisions may require just that result. *United States v.*

*Robel,* 389 U.S. 258, 19 L. ed. 2d 508 (1967), which involved a Communist Party affiliation, aside from holding Section 5(a)(1)(D) of the Subversive Activities Control Act of 1950, 50 U.S.C.A. §784(a)(1)(D), unconstitutional, clearly mandates that no public employe may be discharged from his employment merely because of his political affiliation or his membership in a political organization, since such a discharge would run afoul of the First Amendment. In *United Public Workers v. Mitchell,* 330 U.S. 75, 91 L. ed. 754 (1946), the Court observed, at page 100, that "Congress may not 'enact a regulation providing that no Republican, Jew or Negro shall be appointed to federal office, or that no federal employee shall attend Mass or take any active part in missionary work' ". See also *Wieman v. Updegraff,* 344 U.S. 183, 97 L. ed. 216 (1952). It is clear from these decisions that a government employe may not be dismissed solely on grounds of his political viewpoint or association, i.e., that he may not be dismissed or suspended for the exercise of his First Amendment rights. See, *Pickering v. Board of Education,* 391 U.S. 563, 20 L. ed. 2d 811 (1968); *Keyishian v. Board of Regents,* 385 U.S. 589, 17 L. ed. 2d 629 (1967); *Chalk Appeal,* 441 Pa. 376, 272 A. 2d 457 (1971).

Most recently, the United States Supreme Court, in *Connell v. Higginbotham,* 39 L.W. 4722 (1971), passed upon the validity of a Florida loyalty oath to which each state employe was required to swear or affirm as a condition of obtaining employment. The Court there upheld that part of the oath which required the applicant to swear or affirm that he will support the United States and Florida Constitutions. Mr. Justice MARSHALL, in his concurring opinion in which Mr. Justice DOUGLAS and Mr. Justice BRENNAN joined, pertinently stated, at page 4723: "Such a forward-looking, promissory oath of constitutional support does not in my view offend *the First Amendment's command that the grant*

*or denial of governmental benefits cannot be made to turn on the political viewpoints or affiliations of a wouldbe beneficiary."* (Emphasis supplied.)

As previously noted, I must also disagree with the majority view that the appellees have no rights protected by the Civil Rights Act of 1871, *supra.* In *American Federation of State, Co., & Mun. Emp. v. Woodward,* 406 F. 2d 137 (8th Cir. 1969), the Court of Appeals for the Eighth Circuit held that municipal employes who asserted that they had been discharged because they had joined a labor union had presented a claim which was cognizable under the Civil Rights Act of 1871 and reversed the District Court's dismissal of the complaint.[3] In the course of its opinion the Court stated, at page 139: "The First Amendment protects the right of one citizen to associate with other citizens for any lawful purpose free from government interference. The guarantee of the 'right of assembly' protects more than the right to attend a meeting; it includes 'the right to express one's attitudes or philosophies by membership in a group or by affiliation with it or by other lawful means.' " (Citations and footnote omitted.) See also, *McLaughlin v. Tilendis,* 398 F. 2d 287 (7th Cir. 1968); *Service Employees Internat'l U. v. County of Butler, Pa.,* 306 F. Supp. 1080 (W.D. Pa. 1969). The Court further discussed the various Supreme Court decisions relating to the protections afforded public employes, concluding its discussion, at page 140, with the following: "Again, in Keyishian v. Board of Regents of University of State of New York, 385 U.S. 589, 605, 87 S. Ct. 675, 685, 17 L. ed. 2d 629 (1967), the Court specifically rejected the theory that public employment 'may be conditioned upon surrender of constitutional rights which could not be abridged by direct government action.' "

---

[3] The District Court had dismissed the complaint on the ground that it failed to allege facts constituting a claim.

It is clear that the Legislature may not statutorily exclude from public employment all persons who are members of the Democratic Party, Republican Party, Communist Party, or the American Federation of State, County and Municipal Employees, AFL-CIO, simply because of their membership in such groups. The majority view that the governor may exclude a person from public employment because of his political affiliation, is clearly the proscribed indirect government action mentioned in *Keyishian,* supra, and which we are constitutionally prohibited from condoning.

Further, a claim that an employe has been excluded from public service merely because of his political affiliation does present a proper claim under the Civil Rights Act as an action "under color of . . . custom, or usage, of any State . . ." which subjects a person to "the deprivation of any rights, privileges, or immunities secured by the Constitution. . . ." This is not only clear from the language of the act, but also follows *a fortiori* from the decisions which hold that a claim of exclusion from government employment on the grounds of union membership presents a claim cognizable under Section 1983.

I am not, however, willing to say that the governor may never discharge any public employe merely on the ground of his political affiliation. Such a position would unduly hamper the governor by saddling him with political appointees of a prior administration who not only disagree with his politics, but may be likely to disagree with his policies. It would seem fair, and consonant with constitutional protections, to allow a new governor to dismiss, merely because of political affiliations, any employee who is engaged in a policy making position, or in a position charged with implementing or devising the means of implementing the governor's policies. These are the *employes at will* referred to in *Scott v. Phila. Parking Auth.,* 402 Pa. 151, 166 A. 2d 278 (1960)

and *Mitchell v. Chester Housing Authority*, 389 Pa. 314, 132 A. 2d 873 (1957),[4] cited by the majority. Further, United States Supreme Court decisions, such as *Pickering v. Board of Education,* supra, and *United States v. Robel,* supra, indicate that where the exercise of First Amendment rights will unduly interfere with the orderly functioning of government, those individual rights may be subordinated to the governmental interest, if, in the balance, the governmental interest requires greater protection. See also, *Chalk Appeal,* supra. There can be no question that the appellee-employes in this case will not adversely affect the policy making or implementation functions of government, since these are unskilled and semi-skilled employes whose daily occupations are merely to maintain the public highways. Under such circumstances they may not be discharged for the patently arbitrary and discriminatory reason that they are or were members of the Republican Party.

There is yet one further reason for my disagreement with the majority which is grounded on the new Public Employe Relations Act, Act of July 23, 1970, P. L. 563, No. 195, 43 P.S. §§1101.101 *et seq.* In Article I, entitled "Public Policy", the legislature declared the policy of the Commonwealth to be to protect the rights of public employers, public employes and the public at large and "to promote orderly and constructive relationships between all public employers and their employes, subject, however, to the paramount right of the citizens of the Commonwealth to keep inviolate the guarantees for their health, safety and welfare." Act of July 23, 1970, P. L. 563, No. 195, Art. I, §101, 43 P.S. §1101.101. It seems to me that the "spoils system", at the level here involved, cannot promote the orderly carrying out of the governmental function, nor can it

---

[4] Both cases involved the dismissal of the director of the authority concerned.

protect the rights of public employers and employes. Further, the act provides legislative intent, if not actual statutory protection, by granting to public employes[5] the right to organize and to bargain collectively, so that those employes not already granted statutory job protection may have rights and protection similar to those enjoyed by protected government workers, e.g., Civil Service employes.[6] The "spoils system", as here applied, not only fails to comply with this legislative intent, but also militates against the orderly fulfillment of daily governmental activities and, as such, disserves the public health, safety and welfare.

The conclusion seems inescapable that the dismissals herein contemplated and completed are invalid and improper as violations of the First, Fifth and Fourteenth Amendments of the United States Constitution, the Civil Rights Act of 1871 and the Pennsylvania Public Employe Relations Act as it represents the Commonwealth's public policy. A non-policy making, non-policy implementing public employe may not be discharged merely because of his political affiliations and viewpoints. Before any such public employe may be discharged he is entitled to due process protections which include a hearing, an opportunity to rebut any evidence against him and an opportunity to present evi-

---

[5] Art. III, §301(b) 43 P.S. §1101.301(b) defines public employe to mean: "Any individual employed by a public employer, but shall not include elected officials, appointees of the Governor with the advice and consent of the Senate as required by law, management level employes, confidential employes, clergymen or other persons in a religious profession, employes or personnel at church offices or facilities when utilized primarily for religious purposes and those employes covered under the Act of June 24, 1968 (Act No. 111), entitled 'An Act specifically authorizing collective bargaining between policemen and firemen and their public employers. . . .'"

[6] Indeed, the failure of the legislature to provide civil service protection to some state employes and not to others is in itself an obvious form of discriminatory treatment.

dence in his own behalf. Anything less deprives the employe of federally protected rights. As the United States Supreme Court said in *Wieman v. Updegraff*, 344 U.S. at 192, 97 L. ed. at 222: "It is sufficient to say that constitutional protection does extend to the public servant whose exclusion . . . is patently arbitrary or discriminatory."

I dissent and would affirm the unanimous decision of the Commonwealth Court.

Mr. Justice JONES and Mr. Justice POMEROY join in this dissenting opinion.

---

ORDER PER CURIAM, August 16, 1971:

Petition for reargument denied and supersedeas vacated.

Mr. Justice BARBIERI, with whom Mr. Justice JONES joins, would grant reargument.

By not granting reargument, we have left unconsidered and unresolved a question vital to the Commonwealth and to many of its nonpolicy-making employees —whether or not Section 706 of the recently enacted Public Employee Relations Act permits dismissal of an employee solely because of his political sponsorship even though Section 706 prohibits dismissal except for "just cause."