Stephen M. Sacks, Petitioner *v.* Commonwealth of Pennsylvania, Department of Public Welfare, Respondent.

Argued March 2, 1981, before Judges WILKINSON, JR., BLATT and WILLIAMS, JR., sitting as a panel of three.

*Stanley M. Shingles,* for petitioner.

*Fredric B. Weinstein,* Assistant Attorney General, for respondent.

OPINION BY JUDGE BLATT, April 27, 1981:

This is an appeal from a decision of the Civil Service Commission (Commission) which dismissed the appeal of Stephen M. Sacks (petitioner) from a ten-day suspension without pay from his position of welfare specialist with the Department of Public Welfare (DPW).

On October 4, 1978, the petitioner testified at a public hearing before the Health Systems Agency of Southeastern Pennsylvania, which is responsible for planning health care facilities and establishing guidelines on health care costs in southeastern Pennsylvania. The subject of his testimony was the Philadelphia Health Management Corporation (PHMC), which was established under a federal program to reduce health costs in the Philadelphia area and which is composed of representatives from organizations substantially affected by health services in Philadelphia, including the DPW. In his testimony, the petitioner stated that he was not speaking in a representative capacity for the DPW, but rather that he was speaking as an individual health care consumer. He did, however, identify himself as a public administrator employed by the DPW. He went on to testify that, as a result of a contract with the DPW for health screening of infants,

the PHMC had made a $760,000 "profit" which he characterized as "of questionable propriety; in other words, an apparent rip-off."[1]

The DPW concluded that the petitioner's statements were made with reckless disregard for the truth and constituted insubordination. He was suspended for a ten-day period and this suspension was upheld by the Commission as being for "good cause" under Section 803 of the Civil Service Act, Act of August 5, 1941, P.L. 752, *as amended*, 71 P.S. §741.803.

---

[1] The relevant portion of the petitioner's testimony is as follows:

In another Medical Assistance area, one provider of services was apparently paid over three-quarters of a million dollars in profits for supposedly non-profit work. Since July 1974 to the present time the Philadelphia Health Management Corporation has been the Medical Assistance contractor for providing child health screening. The service is called the Early Periodic, Screening, Diagnostic, and Treatment Program, EPSDT, and as of December 31, 1977, the Philadelphia Health Management Corporation, a non-profit corporation, has made an apparent profit of $768,000 solely from the child screening program.

. . . .

*The $768,000 profit is of questionable propriety; in other words, an apparent ripoff. The funds should probably be repaid to Medical Assistance.*

It should also be noted that 11 people were simultaneously members, both past and present, of the governing boards of the Philadelphia Health Management Corporation and the Health Systems Agency, or the Plan Development Committee. Also, at least two people were simultaneously connected with both the Department of Public Welfare and the Philadelphia Health Management Corporation.

The bottom line of the preceding is that the Health Systems Agency is in a strategic position to mobilize community support to collectively clean up the Medical Assistance Program. The HSA should assert itself in the Medical Assistance arena for Medicaid financial problems affect the ultimate outcome of the proposed Plan. (Emphasis supplied.)

It is true, of course, that the state has a greater interest in regulating the speech of its employees than it does in regulating the speech of the citizenry in general. *Chalk Appeal,* 441 Pa. 376, 272 A.2d 457 (1971). And the Supreme Court of the United States has set forth the following general standard governing the speech of public employees: "The problem in any case is to arrive at a balance between the interests of the ... [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employee." *Pickering v. Board of Education,* 391 U.S. 563, 568 (1971).

In considering the competing interests of governmental efficiency and of free expression, it was held in *Pickering* that if the public statements of a public employee relate to issues of legitimate public concern they are not cause for dismissal unless the employee made false statements knowing them to be false or the statements so closely related to the employee's everyday work environment so as to adversely affect its efficiency.

In *Pickering,* however, the Court noted that the statements of the employee involved did not concern matters about which his position qualified him to speak with greater authority than any other taxpayer. The Court, therefore, did not reach the issue of whether or not allegations contained in the employee's statement[2] were made with reckless disregard of the truth:

---

[2] The employee in *Pickering* was a public school teacher whose letter to the editor of a local newspaper was published with the following factual errors: that the school district was unable to pay teachers' salaries when in fact it could, that the school district spent $50,000 per year on transportation to and from athletic events when in fact it spent $10,000, and that its budget for its athletic program was $200,000 when in fact the budget was only $70,000.

> We are thus not presented with a situation in which a teacher has carelessly made false statements about matters so closely related to the day-to-day operations of the schools that any harmful impact on the public would be difficult to counter because of the teacher's presumed greater access to the real facts. Accordingly, we have no occasion to consider at this time whether under such circumstances a school board could reasonably require that a teacher make substantial efforts to verify the accuracy of his charges before publishing them.

*Pickering v. Board of Education, supra* at 572.

In the present case, the petitioner's testimony concerning health care costs and PHMC's financial surplus clearly touched on a matter of public concern. We believe, however, that, unlike the teacher in *Pickering,* the petitioner's sensitive position as a DPW administrator required that he exercise greater effort to verify his statements and we also believe that there is substantial evidence to support the Commission's finding that the statements were made with a reckless disregard for the truth. The record indicates that the PHMC was awarded a contract by the DPW to administer a health diagnosis program for infants, and that the contract was awarded on a per diagnosis basis with the DPW paying $13.00 for every infant health diagnosis made by the PHMC. DPW representatives also testified that, although the actual cost of the health screenings decreased each year, the DPW was committed to pay the PHMC a flat amount per diagnosis, and the PHMC therefore accumulated a financial reserve. Evidence submitted by the DPW indicated that it cannot legally recoup this financial reserve, but that, because PHMC is a non-profit corporation, the reserve does not accrue to anyone's personal benefit. In consideration of this evidence, which

was available to the petitioner prior to his controversial testimony at the public hearing, the Commission concluded that his statements were made with disregard for the truth.

The petitioner's accusation that DPW and the public were victims of an "apparent rip-off" by PHMC was, in our opinion, so antagonistic to his employer (the DPW, with whom PHMC had a contract) as to constitute insubordination. The use of the word "rip-off" implies, at best, that the PHMC, as an institution, was culpable of financial exploitation of the DPW and of Commonwealth taxpayers; at worst, it implies that PHMC's board members or employees were guilty of misappropriating public funds. Webster's Dictionary (7th ed. 1976).

In *Chalk Appeal, supra,* a welfare caseworker was suspended for ten days for stating at a public meeting that some caseworkers fail to inform assistance receivers of their appeal rights. He also urged welfare recipients to "agitate, agitate, agitate." The Court held that these statements did not constiute insubordination because the statements were not overly antagonistic, in and of themselves, and because they did not refer to fellow employees with whom the caseworker had direct working contact. In the present case, however, the petitioner's statements were, we believe, more antagonistic than were those in *Chalk,* for they suggest impropriety or illegality as opposed to poor work performance. There was also a greater likelihood of their interference with the petitioner's work environment inasmuch as his immediate supervisor at DPW was a PHMC director and the imputation of illegality toward PHMC would be further imputed to the supervisor.

The Commission's order upholding the petitioner's suspension will therefore be affirmed.

## ORDER

AND Now, this 27th day of April, 1981, the order of the Pennsylvania Civil Service Commission in the above-captioned case is hereby affirmed.

Judge WILKINSON, JR. did not participate in the decision in this case.