Robert A. McAULIFFE

v.

Adolf G. CARLSON, Commissioner of Finance and Control of the State of Connecticut.

Civ. No. 15687.

United States District Court, D. Connecticut.

May 30, 1974.

Michael J. Churgin, and Stephen Wizner, New Haven, Conn., for plaintiff.

Maurice Myrun, Asst. Atty. Gen., East Hartford, Conn., for defendant.

## MEMORANDUM OF DECISION ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

NEWMAN, District Judge.

This suit raises interesting questions concerning fees and procedures which Connecticut imposes upon some persons who are mentally ill. The first is whether the State can charge some, but not all, prisoners for their maintenance at a state mental hospital while they are serving a criminal sentence. The second is whether the Commissioner of Finance and Control can automatically become the conservator of state mental patients with modest assets without a hearing to determine their incompetency.

The background facts leading up to the current controversy are not in dispute. On August 26, 1971, plaintiff was sentenced to serve a term of 360 days in the Hartford Community Correctional Center after conviction for breaking and entering. On September 21, 1971, the Commissioner of Corrections transferred him to a state mental health facility, the Security Treatment Center in Middletown.[1] Plaintiff served 218 days of his sentence at the Security Treatment Center and was released on April 26, 1972. Pursuant to Conn.Gen.Stat. § 17–318,[2] the Commissioner of Finance and Control billed plaintiff for $1,098.-07, the cost of his "hospital expense" at the Security Treatment Center computed at the rate of $5.037 per day for 218 days. This sum was collected from social security benefits that defendant was holding as representative payee of the plaintiff. 42 U.S.C. § 405(j).

After expiration of his sentence, plaintiff was involuntarily committed to the Norwich Hospital, a state hospital for the mentally ill. While at Norwich he deposited $150.00 in a patient's account, intending to save the sum for future use. Later he attempted to withdraw money from his hospital account. However, he was informed that the

---

[1]. Two statutes, Conn.Gen.Stat. §§ 17–194a and 17–246, authorize the Commissioner of Corrections to transfer a state prisoner to a state hospital for mental illness. Plaintiff does not claim that the State failed to comply with the commitment requirements of these statutes, nor does he attack their constitutionality. The constitutionality of transfer procedures is a pending issue in Chesney v. Manson, 377 F.Supp. 887 (D. Conn.1974).

[2]. Conn.Gen.Stat. § 17–318 provides:

When any person has been transferred from the State Prison, the State Prison for Women, The Connecticut State Farm for Women or the Connecticut Reformatory to a state hospital, such person's hospital expense prior to the termination of his sentence shall be charged to the state. *When any person has been transferred from a jail to a state hospital, such person's hospital expense prior to the termination of his sentence shall be paid out of the estate of such person, if he has any estate; if he has no estate, it shall be paid by the state.* If any person, whether transferred from the State Prison, the State Prison for Women, The Connecticut State Farm for Women, the Connecticut Reformatory or a jail, is committed to a state hospital after the expiration of his sentence, such person's hospital expense

shall be paid to the state in the manner provided for payment in this chapter. (Emphasis added).

As a consequence of reorganization of Connecticut correctional institutions, references to specific institutions in Conn.Gen.Stat. § 17–318 should be construed as follows:

["State] Prison" . . . shall be construed to mean the Connecticut Correctional Institution, Somers [hereafter CCI, Somers]; "State Prison for Women" shall be construed to mean the maximum security division of the Connecticut Correctional Institution, Niantic [hereafter CCI, Niantic]; "jails" or "jail" shall be construed to mean the Community Correctional Centers . . . and those portions of the Connecticut Correctional Institution, Niantic, used to detain female persons awaiting disposition of pending charges or to confine female persons convicted of, or who plead guilty to, the commission of misdemeanors and who have been sentenced to community correctional centers . . .; "Connecticut Reformatory" shall be construed to mean the Connecticut Correctional Institution, Cheshire [hereafter CCI, Cheshire], "The Connecticut State Farm for Women" shall be construed to mean the Connecticut Correctional Institution, Niantic. Conn.Gen.Stat. § 1–1 (Supp.1973).

funds in his account would not be returned since the Commissioner of Finance and Control had been appointed his conservator, pursuant to Conn.Gen. Stat. § 4–68g,[3] and had used the $150.00 to pay for plaintiff's hospital treatment. Conn.Gen.Stat. § 17–295(c). The Commissioner's appointment as plaintiff's conservator was not preceded by a probate court hearing to ascertain whether plaintiff was "incapable of managing his affairs," Conn.Gen.Stat. § 45–70, as generally required for designation of a conservator.

Plaintiff has moved for summary judgment in this action seeking a declaratory judgment, pursuant to 42 U.S.C. § 1983, that Conn.Gen.Stat. §§ 17–318 and 4–68g violate the Fourteenth Amendment of the United States Constitution. Since the parties do not dispute the existence or the truthfulness of the material facts alleged in the pleadings and in plaintiff's affidavits, the merits of plaintiff's constitutional claims can appropriately be considered.

## I.

### Constitutionality of Conn.Gen.Stat. § 17–318

Plaintiff does not challenge the State's power to charge prisoners for their expenses. Instead, he contends that § 17–318 violates the Equal Protection Clause by creating arbitrary classifications as to which prisoners must pay and which expenses they must pay. Five distinctions are identified, two concerning who must pay, and three concerning what expenses must be paid. (a) Prisoners transferred to a state mental hospital must pay hospital costs if they were transferred from a community correctional center (jail), but not if they were transferred from other penal institutions. (b) Prisoners transferred from a community correctional center to a state mental hospital must pay hospital costs if they are men, but not if they are women. (c) Prisoners covered by § 17–318 must pay for their hospital costs, but not the costs of their maintenance in jail. (d) Prisoners covered by § 17–318 must pay hospital costs if they were transferred to a state hospital for the mentally ill, but not if they were transferred to a general hospital for any other illness. (e) Prisoners covered by § 17–318 must pay for medical care at a state hospital for the mentally ill if they are transferred to such a hospital for in-patient care, no matter how brief their stay, but not for out-patient medical care no matter how prolonged their treatment.

3. Conn.Gen.Stat. § 4–68g provides:
Whenever any person having property or an interest in property is committed or admitted to a state institution for the mentally ill or mentally retarded or, subsequent to such commitment or admission, acquires property or an interest in property, and the property is personal property of any kind or nature, not in excess of five thousand dollars, or annual income not in excess of said amount, no guardian or conservator shall be appointed, and the commissioner of finance and control shall be the guardian or conservator of such person, without court proceedings, only for the purposes hereinafter specified. He shall have authority to make any compromise or exercise any option, with the approval of the attorney general, for the purpose of collecting such funds or property. He shall have authority to release, in behalf of such person, his estate, any bank, insurance company, beneficial organ- ization, executor, administrator, trustee, fiduciary agent, corporation, or individual, and, upon demand, any bank, insurance company, beneficial organization, executor, administrator, trustee, fiduciary agent, corporation or individual shall pay to the commissioner of finance and control, or to such person or persons as said commissioner directs, the amount due. Said commissioner shall hold or use such property or funds for the support and benefit of such person in the same manner as a duly appointed conservator, and shall maintain records of such property or funds and the disposition thereof. The receipt of said commissioner or his agent shall be sufficient authority for such bank, insurance company, beneficial organization, executor, administrator, trustee, fiduciary agent, corporation or individual for such payment, and shall discharge its or his liability therefor.

The parties agree that "strict" judicial scrutiny of these classifications is not appropriate since they are not based upon "suspect" criteria and do not infringe upon "fundamental" rights. Therefore, rather than showing that the classifications created by § 17–318 are premised upon some compelling state interest, the State must prove that they "rationally [further] some legitimate, articulated state purpose and therefore [do] not constitute an invidious discrimination in violation of the Equal Protection Clause. . . . " San Antonio Independent School Dist. v. Rodriguez, 411 U.S. 1, 17, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973).

The first classification distinguishes between those inmates transferred to state mental hospitals from community correctional centers and those transferred from all other penal institutions. Only the former are charged for their hospital costs. Historically, felons were incarcerated in state prisons and misdemeanants were committed to county jails. Consequently, defendant argues, § 17–318 reflects a legislative decision that misdemeanants "should have the same obligation to pay for hospital care as the non-criminal citizen," since, unlike felons, their brief confinement for one year or less does not significantly interfere with their earning capacity or deplete their assets.

In essence, defendant claims that § 17–318 is based upon the common law policy that persons treated at public humane institutions will not be permitted to receive state aid at the taxpayers' expense if they are capable of reimbursing the public for their care.[4] Although statutes providing state aid to citizens generally reflect this policy, its application to state expenditures for maintaining and treating prisoners is less frequent, but not novel. Earlier decisions often upheld the validity of statutes requiring prisoners to reimburse the State for their maintenance.[5] More recent cases have upheld prisoners' liability for mental health treatment received while serving their sentences,[6] or while in custody at state hospitals because they are unable to stand trial by reason of insanity.[7]

Connecticut undoubtedly has a legitimate interest in relieving its taxpayers by requiring prisoners with earning potential or assets to reimburse the State

---

4. The development of this common law policy and its impact upon legislation was traced in State v. Ikey's Estate, 84 Vt. 363, 366–367, 79 A. 850, 851 (1911) :

> By the common law of England it is the duty of the king to take care of all his subjects who, by reason of their imbecility and want of understanding, are incapable of taking care of themselves. . . .
>
> Under our form of government the sovereign state has the same common law duty resting upon it concerning the care and custody of persons and estates of those who are idiots from nativity, or who have lost their intellects, and become *non compos*, or unable to take care of themselves . . . ; and it is manifest from the statutory regulations in this respect that the policy of the state is, as at common law, that the estates of such wards shall be appropriated to their proper maintenance, before they can be supported at the expense of the state. Indeed, . . . the statute concerning the insane poor . . . goes further than this; for in cases falling within the provisions of that section it must be found not only that the insane person is destitute of means to support himself, but also that he is without relatives bound by law to support him, before an order can issue for his confinement at the expense of the state. (Citations omitted).

5. *See* People v. Hawkins, 157 N.Y. 1, 51 N.E. 257; 10 Misc. 65, 31 N.Y.S. 115 (1898) ; Jefferson County v. Hudson, 22 Ark. 595 (1861) ; State v. Isaac, 13 N.C. (2 Dev.L.) 47 (1828) ; Washburn v. Belknap, 3 Conn. 502 (1821).

6. *See* In Re Estate of Hockett v. State Dept. of Social Welfare, 177 Kan. 507, 280 P.2d 573 (1955) ; Green v. State, 272 S.W.2d 133 (Ct.Civ.App. of Tex.1954) ; Auditor General v. Hall, 300 Mich. 215, 1 N.W.2d 516 (1942) ; Auditor General v. Olezniczak, 302 Mich. 336, 4 N.W.2d 679 (1942).

7. *See* Briskman v. Central State Hospital, 264 S.W.2d 270 (Ky.1954) ; Estate of Gestner v. Bank of America Nat'l Trust and Savings Assn., 90 Cal.App.2d 680, 204 P.2d 77 (1949) ; State v. Griffith, 36 N.E.2d 489 (Ct.App. Ohio 1941) ; State v. Ikey's Estate, 84 Vt. 363, 79 A. 850 (1911).

for the expense of maintaining them in state hospitals. However, under the current procedures for placing prisoners in state institutions, this purpose is not rationally furthered by a statutory classification based upon the assumption that a prisoner's place of incarceration is an accurate indicator of his ability to pay his state hospital expense.

Any prisoner, irrespective of the length of his sentence, may be transferred from one correctional facility to another correctional institution if "it appears to the Commissioner [of Corrections] that the best interests of the inmate or the other inmates will be served by such action." Conn.Gen.Stat. § 18–86. Pursuant to § 18–86, a misdemeanant or a felon, initially incarcerated at a Community Correctional Center under a sentence of one year or less,[8] would be transferred to CCI, Somers, if his background or the nature of his offense required rehabilitative treatment available at Somers or commitment to a maximum security institution. Therefore, misdemeanants and felons serving identically brief sentences may be incarcerated at a Community Correctional Center or at CCI, Somers. However, the inmate at the Community Correctional Center will be charged for his state hospital expenses under § 17–318 on the assumption that he has received a shorter sentence than an inmate at CCI, Somers, and will be removed from the competitive job market for a shorter period.[9]

Many inmates at Community Correctional Centers who are billed for their hospital costs may actually be imprisoned for longer periods than inmates at CCI, Somers. A felon receiving an indeterminate sentence in excess of one year from a Circuit Court, Conn.Gen. Stat. § 53a–35, is initially incarcerated at a Community Correctional Center. The Commissioner of Corrections then determines whether he should remain in a Community Correctional Center or whether it would be in the inmate's best interest to transfer him to CCI, Somers, for the balance of his sentence. Since many felons receiving indeterminate sentences may have already earned extensive jail credit awaiting trial and sentencing, they may not be transferred to CCI, Somers, but may serve the remaining portion of their indeterminate sentences in a Community Correctional Center. If his jail time credit is added

---

8. The sentencing provisions of Conn.Gen. Stat. § 53a–35 (d) provide:

(d) . . . [W]hen a person is sentenced for a class C or D felony or for an unclassified felony, the maximum sentence for which does not exceed ten years, the court may impose a definite sentence of imprisonment and *fix a term of one year or less.* (Emphasis added).

9. Under Conn.Gen.Stat. § 18–73, any male person between the ages of sixteen and eighteen years of age who is amenable to reformatory methods may be committed by the Superior Court to CCI, Cheshire, if he is convicted of an offense which is punishable by imprisonment in the CCI, Somers, or in a Community Correctional Center, for a shorter period than life. A minimum reformatory sentence of nine months may be imposed under this section, and a reformatory sentence of any length may be suspended after six months.

Pursuant to Conn.Gen.Stat. § 18–75, the Circuit Court may sentence any male person between the ages of sixteen and twenty-one years of age to CCI, Cheshire, if the maximum penalty for his offense does not exceed imprisonment in state prison for five years. There is no statutory minimum sentence for persons sentenced under this provision, and it is not uncommon for prisoners to be paroled after serving nine months of their sentence.

Correlating these sentencing provisions with § 17–318, a twenty-year-old misdemeanant who is incarcerated at CCI, Cheshire, for nine months pursuant to § 18–75 will not be charged for his state hospital expenses despite his brief period of incarceration. However, another twenty-year-old misdemeanant who serves a nine-month sentence for the same offense in a Community Correctional Center, because he is not amenable to reformatory methods, will be billed for his hospital expenses although his earning capacity is impeded for an equal period of incarceration. Obviously, whatever historical validity may have existed for presuming that individuals in the State Reformatory would be less able to bear their hospital costs than inmates in jail has been significantly diminished by more recent sentencing provisions.

to the remaining portion of his sentence, a felon serving an indeterminate sentence in excess of one year at a Community Correctional Center may actually be imprisoned for a longer period than a felon or misdemeant serving a sentence of less than one year at Somers.

Even if all inmates at CCI, Somers, were incarcerated for longer periods than prisoners at Community Correctional Centers, a statutory classification based upon place of incarceration would not rationally advance the state's interest in charging mental hospital expenses only to prisoners with income or assets. Under Conn.Gen.Stat. § 18–7, an inmate at Somers may be employed during his imprisonment. His wages are deposited in a bank account and are paid to him upon his release. Conn.Gen.Stat. § 18–85. However, if an inmate is still in custody, the warden at CCI, Somers, may pay any portion of the funds to the inmate or his relatives if their expenditure is necessary for the inmate's or his relatives' welfare. *Id.* Since an inmate's transfer from Somers to a state mental hospital is for his own welfare, the funds from his employment would presumably be available for paying his hospital expenses. It is arbitrary to exempt his assets, including his readily-available accrued wages, from being used for his state hospital costs and to charge inmates at Community Correctional Centers for such expenses when they may be unable to obtain employment during confinement or immediately after release, and may be overburdened with other obligations. Moreover, there are less job opportunities in jails than in prisons.

The second classification concerns the distinction between male misdemeanants imprisoned in a Community Correctional Center and female misdemeanants serving identical sentences at CCI, Niantic. Conn.Gen.Stat. § 1–1 (Supp.1973) states that when the term "jail" is employed in a statute, it means ". . . those portions of the Connecticut Correctional Institution, Niantic, used to detain female persons await-ing disposition of pending charges or to confine female persons convicted of, or who plead guilty to, the commission of misdemeanors and who have been sentenced to community correctional centers. . . . " Since § 17–318 provides that the estate of any person who is transferred from a "jail" to a state hospital shall be charged for hospital expenses, it is arguable that female misdemeanants incarcerated at CCI, Niantic, are incarcerated in a "jail" within the meaning of Conn.Gen.Stat. § 1–1 and are therefore liable for their state hospital expenses. However, the State does not dispute plaintiff's point that female misdemeanants at CCI, Niantic, serving the same sentence as a male misdemeanant at a Community Correctional Center are in fact not charged for their state hospital costs under § 17–318.

It is difficult to perceive how a classification based upon the sex of an inmate bears a substantial relation to the State's interest in lightening the burden of taxpayers by charging prisoners with assets for their state hospital expenses. Perhaps this classification was derived from the outdated notion that females in our society do not possess their own income or assets but receive support from their families or spouses. In Frontiero v. Richardson, 411 U.S. 677, 689 n. 23, 93 S.Ct. 1764, 1772, 36 L.Ed.2d 583 (1973), the Supreme Court observed:

> In 1971, 43% of all women over the age of 16 were in the labor force, and 18% of all women worked full time 12 months per year. See U.S. Women's Bureau, Dept. of Labor, Highlights on Women's Employment & Education 1 (W.B. Pub. No. 72–191, Mar. 1972). Moreover, 41.5% of all married women are employed. See U.S. Bureau of Labor Statistics, Dept. of Labor, Work Experience of the Population in 1971, p. 4 (Summary Special Labor Force Report, Aug. 1972). . . . [T]he median income for all women over the age of 14, including those who are not employed, is approximately $2,237. See Statistical Abstract of the United States Table No. 535

(1972), Source: U.S. Bureau of the Census, Current Population Reports, Series P–60, No. 80. . . .

Therefore, current employment statistics for females refute whatever historical validity there may have been for according such differential treatment to female misdemeanants under § 17–318. The Supreme Court's recent upholding of a State's tax exemption for widows, Kahn v. Shevin, 416 U.S. 351, 94 S.Ct. 1734, 40 L.Ed.2d 189 (1974), does not validate Connecticut's attempt to impose added charges upon prisoners simply because they are males.

It is conceivable that it would be more efficient for the State not to bill female misdemeanants at CCI, Niantic, for their state hospital expenses since it might be time consuming to determine which females at Niantic are "in jail" within the meaning of Conn.Gen.Stat. §§ 1–1 and 17–318. Although the Supreme Court is divided on the issue of whether a classification based on sex is inherently suspect,[10] recent decisions unequivocably indicate that "any statutory scheme which draws a sharp line between the sexes, *solely* for the purpose of achieving administrative convenience, necessarily commands 'dissimilar treatment for men and women who are similarly situated,' and therefore involves the 'very kind of arbitrary legislative choice forbidden by the [Equal Protection Clause of the Fourteenth Amendment]. . . .' Reed v. Reed, 404 U.S., at 77, 76, 92 S.Ct. 251." Frontiero v. Richardson, *supra*, 411 U.S., at 690. Obviously, mere administrative convenience is not sufficient to sustain § 17–318's differen-

tial treatment of male and female misdemeanants against a constitutional challenge on equal protection grounds.

Turning now to the variations among payments that are charged, the third classification makes a distinction between maintenance costs at a jail, which are not charged, and maintenance expenses at a mental hospital, which are charged. If, as is likely, maintenance costs at a mental hospital are higher than at a jail, the state's purpose of easing the burden on taxpayers might well be rationally furthered by charging for mental hospital costs but not jail costs. Even if the factual basis for such a distinction were demonstrated, the further distinctions that § 17–318 makes among chargeable costs add to its constitutional infirmity.

The fourth classification makes a distinction between hospitalization costs for mental illness, which are charged, and hospitalization costs for all other illnesses, which are not charged.[11] It may well be that in some instances the costs of mental illness hospitalization exceed the costs of hospitalization for other illnesses, but there has been no demonstration that this is true generally, or for the class of transferred prisoners in particular. The State has not attempted to categorize the costs to be charged by reference to a minimum hospital stay or a minimum dollar amount. It has simply selected mental illness out of all the conditions that may require hospitalization and imposed on one class of prisoners a charge for such care. There is no basis for concluding that this classifica-

10. *See* Kahn v. Shevin, 416 U.S. 351, 94 S. Ct. 1734, 40 L.Ed.2d 189 (1974); Frontiero v. Richardson, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973); Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971).

11. Under § 18–52a, a prisoner incarcerated in a Community Correctional Center who "becomes sick with a disease or malady which requires hospitalization for surgery or other medical care may be transferred . . . to any state hospital having facili-

ties for such care. . . . " Since § 17–318 refers to charging prisoners for state hospital expense without limiting the state's right of reimbursement expenses incurred at state *mental* hospitals, it is arguable that prisoners transferred to state hospitals for surgery or other medical care, are also liable for their hospital expenses. However, the defendant has conceded that the § 17–318 has been applied to obtain reimbursement only for hospital expenses incurred by prisoners transferred to state mental health facilities.

tion of costs rationally furthers a legitimate state interest.

The fifth classification makes a distinction between mental illness expenses of hospitalized prisoners, which are charged, and out-patient mental illness expenses of prisoners, which are not charged. There may be facts to demonstrate that, on the average, hospitalization expenses for mentally ill prisoners exceed the costs of their out-patient care, although the risk of overinclusiveness of this classification appears high, especially in view of the modern trend toward reducing the in-patient treatment time for mental illness. Whether this classification standing alone would invalidate the statute need not be decided, since the combination of all the classifying criteria plainly place the statute beyond the outer limits of even a restrictive view of the equal protection clause.

## II.

### Constitutionality of Conn.Gen.Stat. § 4-68g

■ Conn.Gen.Stat. § 4-68g creates a significant exception to the procedural requirements for the appointment of a conservator for a person receiving state care or assistance.[12] Prior to the appointment of a conservator, patients at state institutions for the mentally ill who have personal property or an annual income of less than $5,000.00 are not afforded the procedural safeguards of notice and an adversary competency hearing by a probate court. Instead, their mere commitment or admission to a state institution for the mentally ill authorizes the Commissioner of Finance and Control to serve as their conservator and to hold or use their personal property

or income for their support and benefit "in the same manner as a duly appointed conservator." Conn.Gen.Stat. § 4-68g. Plaintiff contends that § 4-68g infringes his right to due process of law, guaranteed by the Fourteenth Amendment, because it deprives him of his civil rights to enter and enforce contracts, settle obligations or make gifts of his property without the essential safeguards of notice and an opportunity to be heard on the issue of his competency.

Conn.Gen.Stat. § 4-68g creates the presumption that persons with personal property or assets of less than $5,000.00 are incapable of managing their affairs after commitment or admission to a state mental institution. This presumption of incompetency is irrefutable and irreversible since mental patients falling within the purview of § 4-68g are never afforded the opportunity to establish their ability to manage their affairs.

Prior decisions have indicated that involuntary commitment to a mental institution does not support even a presumption that a mental patient is incompetent. In Winters v. Miller, 446 F.2d 65, 68 (2d Cir. 1971), the Court of Appeals stated:

> . . . [T]he law is quite clear in New York that a finding of "mental illness" even by a judge or jury, and commitment to a hospital, does not raise even a presumption that the patient is "incompetent" or unable adequately to manage his own affairs. Absent a specific finding of incompetence, the mental patient retains the right to sue or defend in his own name, to sell or dispose of his property, to marry, draft a will, and, in general to manage his own affairs. (Citations omitted).

12. Under Conn.Gen.Stat. §. 45-70, the Commissioner of Finance and Control may apply to a probate court for the appointment of a conservator for any person with property who is receiving state care or assistance. If the person receiving state aid is in a state institution, notice of a competency hearing must be left with the supervisor of the institution at least five days before the hearing date. Conn.Gen.Stat. § 45-71. The alleged incompetent may attend the probate hearing with counsel, cross-examine adverse witnesses, and present evidence to refute his competency. If there is evidence sufficient to support a finding that the person receiving state care is "incapable of managing his affairs," the probate court will appoint a conservator for his property. Conn.Gen.Stat. § 45-70.

Relying upon this statement in *Winters,* Judge Blumenfeld indicated in Logan v. Arafeh, 346 F.Supp. 1265, 1269–1270 (D.Conn.1972), that involuntary commitment of a mental patient, pursuant to Conn.Gen.Stat. § 17–183, does not create a presumption of incompetency. By creating an irrebutable presumption of incompetency, § 4–68g denies plaintiff due process of law. *Cf.* Cleveland Bd. of Education v. LaFleur, 414 U.S. 632, 94 S. Ct. 791, 39 L.Ed.2d 52 (1974); Vlandis v. Kline, 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973); Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); Bell v. Burson, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971).

The statute also conflicts with the Equal Protection Clause by exempting from the presumption of incompetency persons who own real property of any value or who possess personal property or income in excess of $5,000.00. These persons are entitled to an independent competency hearing in recognition of the fact that all mental patients are not incapable of managing their affairs. Obviously, it is irrational to think that all or even most state mental patients without real property and without personal property and income of more than $5,000.00 are incompetent.

The State undoubtedly has a legitimate interest in obtaining reimbursement for state mental health care rendered to individuals with assets. There may also be a greater urgency in establishing state control over the estates of state mental health patients with modest assets since their funds could be rapidly depleted.

Pursuant to Conn.Gen.Stat. § 45–72, a probate court may appoint a temporary conservator for thirty days if two physicians certify that a person is incapable of managing his affairs. Prior to the expiration of this thirty-day period, a permanent conservator may be appointed after the alleged incompetent has been afforded a full-scale competency hearing. Conn.Gen.Stat. §§ 45–70 and 45–71. It would appear that these procedures could be used to appoint the Commissioner of Finance and Control as the temporary conservator of state mental health patients with modest estates upon certification by physicians that they are incapable of managing their affairs. Since probate court hearings at state mental institutions are not infrequent, a full-scale competency hearing could be scheduled within thirty days of the appointment of the Commissioner as temporary conservator. Under these procedures, the State would also avoid the cost of administering the estates of mental health patients who are competent. Perhaps the statutes could be amended to permit the Commissioner to initiate such proceedings.

There is also merit to plaintiff's claim that § 4–68g stigmatizes a mental patient as an incompetent without due process of law. In Wisconsin v. Cinstantineau, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1970), the Supreme Court sustained a constitutional challenge to a statute permitting the "posting" of persons as excessive drinkers without affording them notice or an opportunity to be heard. Procedural due process must be satisfied whenever the State attaches a "badge of infamy" to a citizen, although it may "not involve the stigma and hardships of a criminal conviction." Anti-Fascist Comm. v. McGrath, 341 U.S. 123, 168, 71 S.Ct. 624, 647, 95 L.Ed.2d 817 (1951) (concurring opinion). In Dale v. Hahn, 440 F.2d 633 (2d Cir. 1971), the Court of Appeals expressly characterized incompetency as a stigma.

Since the plaintiff's incompetency cannot be presumed from his involuntary commitment to Norwich Hospital, he was not officially branded with the stigma of being unable to manage his affairs until the Commissioner of Finance and Control was appointed his conservator, and this occurred without giving him any hearing on the issue of his competency.

Since Conn.Gen.Stat. §§ 17–318 and 4–68g violate the Fourteenth Amendment, plaintiff's motion for summary

judgment is granted.[13] Judgment will enter declaring § 17–318 unconstitutional to the extent that it imposes hospital costs upon any person transferred from a jail as defined in Conn.Gen.Stat. § 1–1, and declaring § 4–68g unconstitutional in its entirety.

---

13. Plaintiff has requested this Court to order the defendant to return with interest from the date of seizure the property taken from him pursuant to Conn.Gen.Stat. §§ 17–318 and 4–68g. No order appears necessary at present, since it is expected that, in light of this decision declaring the challenged statutes unconstitutional, defendant will agree to return to plaintiff the property taken from him. If this does not occur, plaintiff can apply for a supplemental judgment. At that time consideration can be given to whether defendant has available a defense of sovereign immunity, Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), or whether such defense is inapplicable to what is essentially a claim for restitution.