**Francis X. CALO**

v.

**R. Morris PAINE, Chairman of the Waterbury Parking Authority, Individually and in his official capacity, et al.**

**Civ. No. H–74–269.**

United States District Court,

D. Connecticut.

Nov. 27, 1974.

Raphael L. Podolsky, Victor M. Ferrante, Jr. Waterbury, Conn., for plaintiff.

John D. Mahaney, John F. Phelan, Waterbury, Conn., for defendants.

MEMORANDUM OF DECISION
ON DEFENDANTS' MOTION
TO DISMISS

BLUMENFELD, District Judge.

This is an action brought by plaintiff Francis X. Calo, former probationary Executive Director of the parking authority of the City of Waterbury, pursuant to 42 U.S.C. § 1983 (1970) and 28 U.S.C. § 1343(3) (1970) against the chairman and members of the Parking Authority and the city Civil Service Commission and the mayor alleging that he was dismissed from his position without a prior hearing in violation of his rights to procedural due process and in retaliation for political activities in opposition to the mayor of the city. The matter is currently before the Court on plaintiff's motion for a preliminary injunction, which was denied following a hearing, and defendants' motion to dismiss the complaint. It is unnecessary to detail the reasons for denying the preliminary injunction as such denial was based upon a failure to show irreparable injury and, in addition, must follow from this ruling on defendants' motion to dismiss.

■■ The defendants' motion to dismiss is somewhat ambiguous in that it states that the complaint does not allege a "substantial federal question." Although this could be construed as a motion to dismiss for a lack of federal jurisdiction under 28 U.S.C. § 1343(3), the Court chooses to construe it as a motion to dismiss for failure to state a claim on which relief may be granted. Fed.R.Civ.P. 12(b)(6); Sheahan v. White, Civ.No. 14,986 (D.Conn. May 31, 1972). Additionally, as testimony was presented at the hearing on plaintiff's motion for a preliminary injunction and other materials, including affidavits of the defendants, were submitted by the defendants and not objected to by the plaintiff, the motion will be treated as one for summary judgment. Fed.R.Civ. P. 12(b); Fed.R.Civ.P. 56.

## I.

In October 1973 plaintiff Calo took a competitive civil service examination, offered by the Civil Service Commission of the City of Waterbury, for the position of Executive Director of the Waterbury Parking Authority. On March 6, 1974, his name was certified by the acting director of the Civil Service Commission to the Parking Authority as the highest ranking name on the list of eligibles for that position. On March 11 he commenced employment as Executive Director, but pursuant to the applicable Civil Service Rules and Regulations of the City of Waterbury he was placed on probationary status for the first six months of his employment.

During the next few months, Mr. Calo met with members of the Parking Authority on several occasions and received some evaluation of his performance. There is dispute between the parties as to the frequency of these meetings, whether they were conducted on a regular basis, and the content and scope of the evaluative discussions which took place. However, for the purposes of defendants' motion it may be assumed that there were only three brief meetings and that no detailed criticisms, pointing to specific incidents of poor job performance, were presented to the plaintiff.

On June 13, 1974, plaintiff was asked by defendant Parking Commissioner Giannemore to consider resigning, a course of action which the plaintiff rejected. The request was renewed at an "evaluation" session on June 27, 1974, and once again the plaintiff expressed his intent to remain in his position. The members of the Parking Authority then informed the plaintiff that unless he submitted his resignation by noon of the following day, he would be fired. At the request of plaintiff's attorney who was present at part of the meeting, the issue was deferred and a meeting was scheduled for July 2. On that date, plaintiff, with his attorney present, stated his objection to the Parking Authority's proposed course of action, based upon their failure to detail the reasons for his dismissal and to provide him with an opportunity to refute those charges. Defendant Paine, Chairman of the Parking Authority, offered to detail the basis of the Authority's decision, but the plaintiff refused the offer because of the informal nature of the meeting.

A formal public meeting was held to consider the issue of Mr. Calo's dismissal on July 5. At that meeting the members of the Parking Authority voted to request permission of the director of the Civil Service Commission to remove the plaintiff from his position. In addition, at the plaintiff's insistence, a letter from the Authority to the Acting Director of Personnel of the Waterbury Civil Service Commission, setting forth the grounds for his dismissal, was read into the record. The relevant portions of that letter stated:

"During this probationary period, due to his lack of tact, his abrasive personality, his lack of respect and consideration for the knowledge, ability, time and interest of personnel of the Parking Authority, his over-reacting to unfamiliar situations, his making moves and statements without sufficient knowledge or background of matter under consideration, have caused employee relations to deteriorate very markedly with the result that performance has suffered and public relations have suffered.

"Lacking cooperation, credibility and respect, there is no way in which the operation of the Authority can continue to be successful. No purpose would be served in continuing the probationary period, since the situation has already become intolerable and is not one which can be remedied by additional exposure and/or training. The many incidents of conflict involve not only personnel of the Authority but members of the public and others with whom the Authority has relations. Irreparable damage may have been done already."

There is no dispute, and the minutes of the meeting reflect, that the defendants were hesitant to publicize the reasons for the dismissal, but deferred to the plaintiff's request. It is clear from the minutes of the meeting that the plaintiff was not provided an opportunity to respond to the charges in any way and that, in fact, the vote on his removal took place prior to the arrival of his attorney at the meeting.

On July 5 the Civil Service Director ratified the Authority's decision and plaintiff was dismissed from his position, subject to his right to receive pay for the next two weeks. Subsequent to his dismissal, plaintiff made several requests for a hearing before the Civil Service Commission, but was refused. There is no dispute that at no time either before or after July 5 did the defendants provide the plaintiff with notice of the specific charges against him, an opportunity to confront witnesses or to refute the generalized charges contained in the July 5 letter.

Mr. Calo is a political figure of sorts in the City of Waterbury, having served on the Board of Tax Review and having sought the nomination for Comptroller of the City of Waterbury in September 1973 on a Democratic primary slate in opposition to the slate headed by the current mayor of Waterbury, a defendant in this action. Mr. Calo and his slate lost that election.

Probably as a result of his political activity, the events surrounding his dismissal were the subject of fairly substantial coverage in the local newspapers. He has attached to his complaint copies of 14 articles which appeared in the newspapers. Most of them detail the developing procedural status of his dismissal and his subsequent efforts to obtain review of the decision of the Civil Service Commission. Only two of the articles mention the reasons for the dismissal, as set out in the letter of July 5. However, the defendants admit that the dismissal did receive considerable publicity and was a matter of substantial public interest.

Finally, there is no dispute that plaintiff Calo has remained unemployed since the date of his dismissal midway through his probationary period. The extent of his efforts to obtain employment, however, remains substantially undisclosed.

## II.

Defendants first argue that their action in dismissing the plaintiff was not under color of state law as required by 42 U.S.C. § 1983 (1970). They acted pursuant to the Civil Service Rules and Regulations of the City of Waterbury which were adopted in 1962 following an amendment to the City Charter providing for the creation of a civil service system. From this they draw the conclusion that they were acting pursuant to municipal, not state, law.

This is not a case in which a municipality or agency thereof is named as a defendant. The plaintiff is properly suing individual members of the Parking Authority, members of the Civil Service Commission and the mayor in their individual and official capacities. Thus, no issue is presented as to whether a governmental entity is a "person" for the purposes of 42 U.S.C. § 1983 (1970). City of Kenosha v. Bruno, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973); Monroe v. Pape, 365 U.S. 167, 187–192, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). Rather, the question presented is whether individuals who act pursuant to regulations promulgated by a city civil service commission are acting under color of state law.

 Regardless of what the situation might be in other cases, it is clear that at least here the defendants' action was under color of state law. In State ex rel. Sloane v. Reidy, 152 Conn. 419, 209 A.2d 674 (1965), the Connecticut Supreme Court discussed and upheld as valid the Waterbury civil service system. At issue in that case was whether the procedure established under the Connecticut Home Rule Act for creating municipal civil service systems preempted the preexisting authority contained in the Waterbury City Charter.

The Court held that it did not and therefore the Waterbury civil service system had been validly created. What is of interest to the instant case, however, is the Supreme Court's observation that "[b]*eing a creature of the state*, the city of Waterbury has only such powers as have been granted to it by the legislature, whether by general or special act." *Id.* at 423, 209 A.2d at 676 (Emphasis added.) In light of this authoritative analysis of the relationship of the city of Waterbury to the state, it is clear that whenever an official of that city acts pursuant to municipal law, he also acts under color of state law. *See* Love v. Navarro, 262 F.Supp. 520 (C.D. Cal.1967); *cf.* Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); Kissinger v. New York City Transit Authority, 274 F.Supp. 438 (S.D.N.Y. 1967).

## III.

The plaintiff's first claim is that the defendants have violated his fourteenth amendment rights to due process by dismissing him without first providing a statement of specific reasons for his dismissal and a pretermination hearing. All parties agree that the merits of this claim must be judged by the standards contained in Board of Regents of State Colleges v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) and Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

*Roth* established that a public employee is entitled to a due process hearing only if he can demonstrate that his dismissal deprived him of an interest in "liberty" or that he had a "property" interest in his continued employment. Plaintiff Calo argues that under the terms of the Waterbury Civil Service Regulations he had such a "property" interest and also that, as a result of his dismissal and the publicity surrounding it, he has been deprived of an interest in "liberty."

*Property*

■ There is no basis for plaintiff's contention that he had a property interest in his continued employment and thus was entitled to a pretermination hearing. In *Roth* the Court held that:

"To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Id.*, 408 U.S. at 577, 92 S.Ct. at 2709

In Perry v. Sindermann, 408 U.S. at 601, 92 S.Ct. at 2699, the Court made clear that such a legitimate claim could be predicated on something other than a formal tenure contract; it could also be based upon "rules or mutually explicit understandings that support his claim of entitlement to the benefit . . . . "

In this case, there was neither a formal contract of tenure nor such mutually explicit understandings. The plaintiff was hired and was immediately placed upon probationary status for a period of six months. Section 1 of Chapter IX of the Waterbury Civil Service Rules and Regulations states:

"The probationary period shall be regarded as an integral part of the examination process and shall be utilized for closely observing an employee's work, for securing the most effective adjustment of a new or promoted employee to his position and for rejecting any employee whose performance is not satisfactory."

The plaintiff recognizes that he had no entitlement to continued employment beyond the initial six-month probationary period. However, he argues that he did have a legitimate expectation of continued employment *during* the six-month period and thus could not be fired without a hearing before the end of the six-month period. This argument is without merit.

The power of the Parking Authority to dismiss the plaintiff during his pro-

bationary period is governed by Section 5 of the Waterbury Civil Service Rules and Regulations, which provides in relevant part:

"(a) At any time during the probationary period, a department head, with the approval of the Director of Personnel, may remove an employee if in his opinion the working test period indicates that such employee is unable or unwilling to perform the duties of the position satisfactorily or that his habits and lack of dependability do not merit his continuance with the service. Upon such removal, a report in writing shall be sent to the Director of Personnel and to the employee listing the reasons for removal.

"(b) If an employee has committed an offense which is considered cause for disciplinary action under Chapter XII, he may be dismissed by his department head without prior notice. The written report listed in Section 6(a) [sic] above is mandatory.

"(c) If, however, an employee is dismissed because of his failure to adjust properly to his job, he shall be given fourteen calendar days' advance notice." [1]

Probation was established as a period during which department heads could observe the performance of employees and dismiss them, with the concurrence of the Director of Personnel, if in their opinion the employee failed to perform his work satisfactorily. The joint discretion given to the department head and the Director of Personnel was clearly intended to be unfettered. The above-quoted regulation provides no support for plaintiff's argument that at least during the six-month probationary period such discretion was to be curbed and subject to the employees' right to a due process hearing prior to dismissal. The regulation provides no basis for establishing a legitimate, objective claim to continued employment during the period of probation. Any such expectation which a probationary employee might have could only be unilateral and subjective and thus not entitled to due process protection. See Canty v. Board of Education of City of New York, 470 F.2d 1111 (2d Cir. 1972), cert. denied, 412 U.S. 907, 93 S.Ct. 2301, 36 L.Ed.2d 973 (1973).

*Liberty*

Under the standards established in *Roth,* a public employer may not dismiss an employee without a due process hearing if the dismissal adversely affects either one of two interests, included within the concept of liberty, interests which shall be referred to as the "reputational" and "employability" interests. To establish a violation of his "reputational" interest, plaintiff Calo would have to prove that the reasons given for discharging him "might seriously damage his standing and associations in his community." [2] To establish an injury to his interests in "employability," the plaintiff would have to show that the dismissal reasons had imposed

---

1. It is clear from the record that the plaintiff did receive his 14 days' advance notice. The plaintiff does not dispute this.

2. "The State, in declining to rehire the respondent, did not make any charge against him that might seriously damage his standing and associations in his community. It did not base the nonrenewal of his contract on a charge, for example, that he had been guilty of dishonesty, or immorality. Had it done so, this would be a different case. For '[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an op-portunity to be heard are essential.' Wisconsin v. Constantineau, 400 U.S. 433, 437 [91 S.Ct. 507, 510, 27 L.Ed.2d 515]; Wieman v. Updegraff, 344 U.S. 183, 191, [73 S.Ct. 215, 219, 97 L.Ed. 216]; Joint Anti-Fascist Refugee Committee v. Mc-Grath, 341 U.S. 123, [71 S.Ct. 624, 95 L.Ed. 817]; United States v. Lovett, 328 U.S. 303, 316–317, [66 S.Ct. 1073, 1079, 90 L.Ed. 1252]; Peters v. Hobby, 349 U.S. 331, 352 [75 S.Ct. 790, 801, 99 L.Ed. 1129] (Douglas, J., concurring). See Cafeteria & Restaurant Workers v. McElroy, 367 U.S. 886, 898, [81 S.Ct. 1743, 1750] 6 L.Ed.2d 1230]." 408 U.S. at 573, 92 S.Ct. at 2707.

upon him "a stigma or other disability that foreclosed his freedom. to take advantage of other employment opportunities." [3] *Roth,* 408 U.S. at 573, 92 S.Ct. at 2707.

### *"Reputational" Interest*

██ ██ In this case, the Court finds that the plaintiff's "reputational" interest has not been adversely affected by any action taken by the defendants. The plaintiff relies upon the charges contained in the letter of July 5, such as "lack of tact," "abrasive personality," and the deterioration of employee relations, to establish that the defendants have impugned his good name. To be sure, there is no dispute that these charges did receive widespread publicity in the local press. However, those charges were contained in the July 5 letter from the Authority to the Civil Service Director, the contents of which would have been disclosed to the plaintiff but would not have been made public but for the plaintiff's explicit request that they be made part of the public record of the July 5 meeting. Plaintiff cannot himself cause uncomplimentary statements to be publicized and then rely upon such publication to establish an injury to his reputation. But for the plaintiff's own action, the public would only have known that he was being dismissed for generally unsatisfactory work. While the dismissal itself may have had some tendency to reveal inability to meet job require-

ments, it can hardly be asserted that a mere dismissal from a public position, unaccompanied by a statement of reasons, could establish the kind of serious reputational injury contemplated by the Supreme Court in *Roth. Cf. Roth,* 408 U.S. at 574, n. 13, 92 S.Ct. 2701, 33 L.Ed. 2d 548; Suarez v. Weaver, 484 F.2d 678 (7th Cir. 1973); Russell v. Hodges, 470 F.2d 212 (2d Cir. 1972).

### *"Employability" Interest*

Despite the absence of any injury to a "reputational" interest, it is still necessary to consider whether there has been an injury to the "employability" interest which would support a claim for due process. The defendants have admitted that the letter of July 5 has been placed in the plaintiff's personnel file. Presumably, it will be referred to and possibly quoted from when a prospective future employer of the plaintiffs requests information regarding his job performance as Executive Director. Thus, despite the defendants' innocence in publicizing the contents of the letter, the presence of that letter in the plaintiff's personnel file may "[foreclose] his freedom to take advantage of other employment opportunities." *Cf.* Shirck v. Thomas, 486 F.2d 691 (7th Cir. 1973); Suarez v. Weaver, *supra.*

The question, however, of the standard to be applied in determining what constitutes a foreclosure of other employment opportunities is far from clear. In *Roth* the Court spoke in terms of the

---

3. "Similarly, there is no suggestion that the State, in declining to re-employ the respondent, imposed on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities. The State, for example, did not invoke any regulations to bar the respondent from all other public employment in state universities. Had it done so, this, again, would be a different case. For '[t]o be deprived not only of present government employment but of future opportunity for it certainly is no small injury . . . . .' Joint Anti-Fascist Refugee Committee v. McGrath, *supra,* 341 U.S. at 185 [71 S.Ct. (624) at 655] (Jackson, J., concurring). See Truax v. Raich, 239

U.S. 33, 41 [36 S.Ct. 7, 10, 60 L.Ed. 131]. The Court has held, for example, that a State, in regulating eligibility for a type of professional employment, cannot foreclose a range of opportunities 'in a manner . . . that contravene[s] . . . Due Process,' Schware v. Board of Bar Examiners, 353 U.S. 232, 238 [77 S.Ct. 752, 756, 1 L.Ed.2d 796], and, specifically, in a manner that denies the right to a full prior hearing. Willner v. Committee on Character, 373 U.S. 96, 103 [83 S.Ct. 1175, 1180, 10 L.Ed.2d 224]. See Cafeteria Workers v. McElroy, *supra,* 367 U.S. at 898 [81 S. Ct. [1743] at 1750]." 408 U.S. at 573–574, 92 S.Ct. at 2707.

imposition of a stigma or other disability. It is reasonably clear that by "other disability" it had in mind situations in which the dismissal would leave an individual legally incapable of taking advantage of other employment opportunities. No such issue is presented under the facts of this case. Thus, the only issue is whether the charges against him constituted a stigma.

Before proceeding to the issue of what kinds of charges constitute a "stigma," it must first be decided whether in making such a determination a court should only look at the charges themselves or whether it should also consider testimony as to the actual impact which a discharge has had upon an employee's ability to obtain employment. In *Roth* the Court left this issue unsettled. It is clear that it recognized that certain kinds of charges, such as imputations of bad moral character or membership in a subversive organization, would constitute "stigmas per se"; that is, their natural effect would be to foreclose employment opportunities. In such cases it would be unnecessary to consider evidence of the actual impact which the charges might have had upon an individual's employability.

What is not clear from *Roth*, however, is whether there might be a category of charges that do not rise to the level of a "stigma per se," but which could require an employer to grant a due process hearing if the discharged employee could prove that his dismissal had *in fact* impaired his ability to obtain future employment. At footnote 13 in *Roth* the Court stated:

"The District Court made an *assumption* 'that non-retention by one university or college creates concrete and practical difficulties for a professor in his subsequent academic career.' 310 F.Supp. [972], at 979. And the Court of Appeals based its affirmance of the summary judgment largely on the premise that 'the substantial adverse effect non-retention is likely to have upon the career interests of an individual professor'

amounts to a limitation on future employment opportunities sufficient to invoke procedural due process guarantees. 446 F.2d 806, at 809. But even assuming, *arguendo*, that such a 'substantial adverse effect' under these circumstances would constitute a state-imposed restriction on liberty, the record contains no support for these assumptions. There is no suggestion of how nonretention might affect the respondent's future employment prospects. Mere proof, for example, that his record of nonretention in one job, taken alone, might make him somewhat less attractive to some other employers would hardly establish the kind of foreclosure of opportunities amounting to a deprivation of 'liberty.' Cf. Schware v. Board of Bar Examiners, 353 U.S. 232, [77 S. Ct. 752, 1 L.Ed.2d 796]." *Id.* at 574, 92 S.Ct. at 707.

In the *arguendo* portion of that footnote, the Court does seem to suggest that under some circumstances it might be appropriate to consider evidence regarding the actual impact which charges might have or did have upon an employee's ability to obtain employment. At the same time, however, it did make it clear that evidence that an individual was "somewhat less attractive" as an employee would not be sufficient to require a due process hearing. What might be sufficient is left unspecified.

Regardless of the possible application of the above quoted footnote, it is quite clear that lower courts have almost universally ignored the suggestion and have rendered judgment solely on the basis of whether they consider the circumstances of a dismissal to be stigmatizing per se. *See, e. g.*, Suarez v. Weaver, *supra*; Lipp v. Bd. of Education of City of Chicago, 470 F.2d 802 (7th Cir. 1972); Russell v. Hodges, *supra*; Berry v. Hamblin, 356 F.Supp. 306 (M.D.Pa.1973); Hajduk v. Vocational Technical & Adult Education District No. 13, 356 F.Supp. 33 (E.D.Wis.1973); Sayah v. United States, 355 F.Supp. 1008 (C.D.Cal.1973); Heaphy v. United States

Treasury Dept., Bureau of Customs, 354 F.Supp. 396 (S.D.N.Y.1973), aff'd, 489 F.2d 735 (2d Cir. 1974). *But cf.* Abeyta v. Town of Taos, 499 F.2d 323 (10th Cir. 1974); Perkins v. Regents of University of Calif., 353 F.Supp. 618 (C.D.Cal.1973). They have thereby implicitly rejected as irrelevant the actual impact which the dismissal has had upon an individual's employability.

Although this may seem harsh, it really is the only workable method for determining what charges are sufficiently severe to constitute a deprivation of liberty. It is already difficult enough for an employer to determine prior to the issuance of reasons for discharging an employee whether he will subsequently be required to afford the employee a due process hearing at which time the latter can respond to the charges in order to clear his name. But there is a developing body of law on this issue and the employer with the aid of counsel might be able to make some reasonable guesses as to what kinds of statements would constitute a "stigma per se." If, however, a due process hearing were ordered whenever a discharged employee could demonstrate that he had, in fact, been unable to obtain employment, there would be no possibility of ever determining in advance of a dismissal whether a due process hearing would subsequently be required. The inevitable result would be that employers would dismiss without reasons, a result which the Second Circuit has termed "self-defeating" in that "the employee would lose the benefit of knowing what might profit him in the future." Russell v. Hodges, 470 F.2d at 217.

■ In addition, considering such evidence could lead to the anomalous result of a constitutionally permissible dismissal becoming progressively unconstitutional as the employee encountered difficulties in his search for a new job. At what point in the employee's unhappy search would a court be justified in stepping in and requiring a due process hearing? How great an effort in seeking employment should a court require

of a dismissed employee before granting relief? These questions and others involving serious problems of proof would render the concept of "liberty" as outlined in *Roth* both standardless and judicially unmanageable. The implicit determination by most lower courts to deal with this issue on a *per se* basis can be the only acceptable approach.

In reviewing the case law on this issue, it becomes apparent that although courts have noted the existence of the distinct "reputational" and "employability" interests involved in *Roth*, no standards have been suggested which would differentiate the two. The cases seem to suggest that the same kinds of statements that would injure an employee's reputation in the community would also impose a stigma foreclosing future employment opportunities. *See, e. g.,* Lombard v. Bd. of Ed. of City of New York, 502 F.2d 631 (2d Cir. 1974); Russell v. Hodges, *supra.* This is understandable because in most cases the individual's "reputational" and "employability" interests were both involved and thus the courts did not have to draw the distinction. In the instant case, however, the "reputational" interest is not involved and thus this Court must attempt to articulate a standard for assessing the stigmatizing impact of dismissal statements under the terms of *Roth.* In trying to arrive at such a standard, the existing case law, although not determinative, can certainly provide guidance.

Courts dealing with this issue in general have found it very difficult to formulate standards by which to judge employer dismissal statements. There are certain kinds of statements which have universally been considered stigmatizing. These would include charges of drunkenness, Wisconsin v. Constantineau, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971); membership in subversive organizations, Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817 (1951); dishonesty, McNeill v. Butz, 480 F.2d 314 (4th Cir. 1973); Newcomer v. Cole-

man, 323 F.Supp. 1363 (D.Conn.1970); immorality (including unethical professional conduct), *Roth, supra*; Suarez v. Weaver, *supra;* and mental instability or legal incompetency, Lombard v. Bd. of Ed. of City of New York, *supra*; Dale v. Hahn, 440 F.2d 633 (2d Cir. 1971); McAuliffe v. Carlson, 377 F. Supp. 896 (D.Conn.1974). However, there is little agreement as to the injurious effect of a wide range of other critical dismissal statements. *Compare, e. g.,* Ortwein v. Mackey, 358 F.Supp. 705 (M.D.Fla.1973) *with* Berry v. Hamblin, *supra.* Some courts have attempted to establish tests to be applied in making these determinations. For example, in Hajduk v. Vocational Technical and Adult Education District No. 13, *supra,* the Court held that a teacher was not entitled to a due process hearing because the charges against him "did not suggest immorality or irresponsibility, nor did they amount to such a conclusive evaluation of plaintiff's professional competence as would injure his good name." However, even this standard has not been easy to apply in a principled, predictable manner. *Compare* Whitney v. Board of Regents, 355 F. Supp. 321 (E.D.Wis.1973) *with Hajduk, supra* and Carpenter v. City of Greenfield School District No. 6, 358 F.Supp. 220 (E.D.Wis.1973).

 In Russell v. Hodges, *supra,* the Second Circuit considered whether the dismissal of a police officer for sleeping on duty, absence from a post without authorization and wearing improper attire deprived the officer of some "liberty" interest. In concluding that the officer had suffered no such deprivation under the terms of *Roth,* the Court said:

> "While Fletcher's case, see fn. 2, may be a shade closer, we believe the Court was thinking of something considerably graver than a charge of failure to perform a particular job, lying within the employee's power to correct; the cases cited as illustrations involved charges of chronic alcoholism or association with subversive organizations. Indeed, a general rule that in-

forming an employee of job-related reasons for termination created a right to a hearing, in circumstances where there was no constitutional requirement for the state to do anything, would be self-defeating; the state would merely opt to give no reasons and the employee would lose the benefit of knowing what might profit him in the future." 470 F.2d at 217.

Although it is quite clear that the Court did not expressly distinguish between the "reputational" and "employability" interests, the standard which it does establish is very close to what this Court considers to be an appropriate definition of *stigma* in this context. A dismissal statement is stigmatizing if it charges an employee with immorality, dishonesty or some serious personality defect or societally condemned status which is beyond the power of the individual to change.

 When measured against this standard, it is quite clear that the charges contained in the dismissal letter of July 5 are not stigmatizing. Mr. Calo is generally portrayed in that letter as an individual who is "abrasive," makes snap judgments and is difficult to work with. There are no suggestions that the plaintiff is dishonest or mentally unstable. He is merely charged with lacking the personality traits necessary for the position of Executive Director. This is not an imputation of some *serious* personality defect, nor is it the kind of personality trait which is beyond the ability of plaintiff Calo to change. The letter of July 5 did not stigmatize the plaintiff and thus did not foreclose his opportunities to take advantage of other employment opportunities in the sense intended in *Roth.* He is therefore not entitled to a due process hearing.

## IV.

The plaintiff also claims that the defendants are being disingenuous when they claim that they fired him for incompetence on the job. Rather, he asserts, they fired him in retaliation for

his partisan political activity in September 1973. As detailed above, plaintiff Calo ran and lost in the Democratic primary on a slate opposing that headed by Victor Mambruno, the present mayor of Waterbury and a defendant in this action. He alleges that defendants Paine, Giannemore and Barton, all members of the Parking Authority, and defendant Provost, Acting Director of Personnel of the Waterbury Civil Service Commission, are personal and political friends of defendant Mambruno and that together they acted to dismiss him as an act of political retaliation. This, he alleges, violated his rights of political association under the first and fourteenth amendments and entitles him to automatic reinstatement, regardless of what other constitutionally permissible reasons may have existed for the dismissal. Simard v. Board of Education of Town of Groton, 473 F.2d 988, 995 (2d Cir. 1973); Fluker v. Alabama State Board of Education, 441 F.2d 201, 210 (5th Cir. 1971).

 The defendants submitted in support of their instant motion the affidavits of the defendants in question, all of whom aver that political considerations played no part in the decision to dismiss the plaintiff. The plaintiff did not submit any documentation to contradict the defendants' affidavits, nor was there any contrary evidence presented at the hearing held on plaintiff's motion for a preliminary injunction because of an agreement between opposing counsel to restrict that hearing to the issue of due process violations. However, if the factual dispute were of a material nature, this Court would not grant the defendants' motion on this count without first giving the plaintiff an opportunity to respond with affidavits, answers to interrogatories, or depositions.

A motion for summary judgment should not "be entered until the party opposing the motion has had a fair opportunity to conduct such discovery as may be necessary to meet the factual basis for the motion. It is especially important to observe these procedural requirements when evidence of motivation is of critical importance." Illinois State Employees Union, Council 34 v. Lewis, 473 F.2d 561, 565–566 (7th Cir. 1972), cert. denied, 410 U.S. 928, 93 S.Ct. 1364, 35 L.Ed.2d 590 (1973).

 However, this Court is constrained by the ruling of the Second Circuit in Alomar v. Dwyer, 447 F.2d 482 (1971), cert. denied, 404 U.S. 1020, 92 S.Ct. 683, 30 L.Ed.2d 667 (1972) to hold that even assuming such a retaliatory motivation, the plaintiff's constitutional rights were not violated by his dismissal. In *Alomar* the Court considered the issue of whether an incoming Republican city administration could fire Democratic city employees upon their refusal to switch party affiliation. The Court held that "the sole protection for government employees who have been dismissed for political reasons must be found in civil service statutes or regulations." *Id.* at 483. *See* American Federation of State, County and Municipal Employees v. Shapp, 443 Pa. 527, 280 A.2d 375 (1971); Nunnery v. Barber, 365 F.Supp. 691 (S.D. W.Va.1973); Moldawsky v. Lindsay, 341 F.Supp. 1393 (S.D.N.Y.1972). *But cf.* Illinois State Employees Union, Council 34 v. Lewis, *supra;* [4] Bond v. County of Delaware, 368 F.Supp. 618 (E.D.Pa. 1973).

 To be sure, the facts in the instant case are different from those involved in *Alomar*. Waterbury has chosen to insulate the position of Executive Director of the Waterbury Parking

---

4. Even under the holding in Illinois State Employees Union, Council 34 v. Lewis, *supra* plaintiff Calo would not necessarily be constitutionally protected from dismissal for political reasons. The rationale of that case was restricted to employees in non-policy-making positions. *See* Indiana State Employees

Assn. v. Negley, 365 F.Supp. 225 (S.D.Ind. 1973); Jafree v. Scott, 372 F.Supp. 264 (N.D.Ill.1974). Although this Court has heard no evidence regarding the job responsibilities of the Executive Director of the Waterbury Parking Authority, it is likely that it is a policy-making position.

Authority from political pressures by including it within the civil service system. That fact, however, does not change the nature of the constitutional considerations involved here. That a politically motivated dismissal may be proscribed under city regulations does not render such a dismissal unconstitutional if it would not be in the absence of such a regulation. The plaintiff's remedy is in the state, not the federal, courts. *Cf.* Rosenberg v. Martin, 478 F.2d 520 (2d Cir.), cert. denied, 414 U.S. 872, 94 S.Ct. 102, 38 L.Ed.2d 90 (1973).

█ Finally, the plaintiff has stated an independent claim against the defendants under 42 U.S.C. § 1983 that they conspired to deprive the plaintiff of the same alleged constitutional rights. As the plaintiff suffered no deprivation of any constitutional rights, this claim must also fail.

Accordingly, judgment shall be entered for the defendants on all counts.

So ordered.