## Luna v. Caliguiri

*Clifford Cooper,* for plaintiffs.
*Arthur Gilkes, Jr.,* for defendants.

SILVESTRI, *J.,* October 17, 1980—This amended class action in equity was brought by Belle Luna, Lorraine Goodwin and Ronald Miller as representative plaintiffs on behalf of themselves and all other employes of the City of Pittsburgh similarly situated. Luna and Goodwin allege they were discharged from their positions with the city because they exceeded the weight limitations for their position. Miller claims that for this same reason, he was denied employment by the city. The representative plaintiffs allege that the city through its civil service commission, herein commission, in applying its minimum-maximum weight limitations according to height is in violation of their due process and equal protection rights afforded them under the Constitutions of the United States and Pennsylvania and also in violation of their rights under the Pennsylvania Human Relations Act of October 27, 1955, P.L. 744, as amended, 43 P.S. §951.

Upon filing of their complaint, the representative plaintiffs, prior to any answer being filed by defendants, moved for a preliminary injunction to be made permanent upon final hearing, seeking to enjoin the city from applying its minimum-maximum

weight limitations, reinstatement of Luna and Goodwin, employment of Miller and back pay.

A hearing was held on representative plaintiffs' application for a preliminary injunction. Most of the relevant evidence presented by the representative plaintiffs was by way of stipulation with the defendants plus the testimony of the assistant director, secretary and chief examiner of the civil service commission of the city. Defendants did not produce any evidence. The following facts are established as a result of the hearing on the application for a preliminary injunction.

## LUNA

Luna was employed by the city under the Comprehensive Employment Training Act, known as CETA, as a communications clerk on March 26, 1979.[1] As a communicatons clerk, Luna, in addition, performed the duties of a detention officer.

As of March 26, 1979 Luna was five feet two inches tall and weighed 245 pounds.

Sometime after March 26, 1979 at a time not appearing in the record, Luna applied for a permanent position as detention officer in the police department of the city and took the civil service examination.

On May 21, 1980 the commission sent a letter to Luna advising her that she did not meet the weight requirements for transfer to the regular city position of detention officer, indicating her weight to be

---

1. Those employed by the city under the CETA program were not subject to civil service regulation for the reason that such employment was considered temporary. If a CETA employee sought permanent employment with the municipality, then they were subject to civil service regulation where applicable.

242 pounds and the maximum weight for her height was 152 pounds; Luna was given 45 weeks to engage in a weight reduction program to be monitored by the commission; that if she did not progress satisfactorily (lose two pounds per week) she would not be eligible for continued employment and would be terminated. Luna acknowledged in writing she understood the contents of the letter and agreed that if she did not maintain satisfactory progress in weight reduction that her employment with the city would be terminated.

Also on May 21, 1980 Luna was given a physical examination by a city physician who noted her height to be 62 inches and her weight as 242 pounds; in all other aspects of the examination given by the physician, Luna passed.

On May 28, 1980 the commission by letter to the Superintendent of the Police Department of the city stated: ". . . your nominee for the appointment of detention officer, Department of Police, has passed the required examination of the Civil Service Commission and Miss Luna is eligible for appointment to the position of detention officer."

On June 2, 1980 Luna was employed as a detention officer[2] in the department of police of the city.

---

2. The duties of a detention officer as prescribed in the job description published by the city are: "Receives prisoners from arresting officers, logs name and other necessary information, searches prisoners for drugs or weapons and issues receipts for all confiscated possessions. Locks prisoners in cells, patrols cell blocks, and brings food to prisoners. Escorts prisoners when necessary. Maintains cell block supplies, keeps routine records, and may perform other occasional duties such as relieving Communication Clerks or assisting in the Identification Section. Performs other related duties as needed or assigned."

Luna did not engage in any supervised weight loss program but attempted to diet "on her own;" she neither lost weight nor reported to the commission for weight monitoring. On July 10, 1980 the commission wrote to Luna advising her that the commission would no longer certify her payroll effective July 11, 1980 by reason of her failure to report as scheduled for monitoring of her weight. On July 11, 1980 the superintendent of the police department wrote to Luna advising her of her termination as a police department employe by reason of the commission not certifying her as a detention officer because of her physical examination.

On July 22, 1980 Sergeant John Palumbo, one of her supervisors wrote a letter, the record does not indicate to whom it was sent, in which he stated: "Please be informed that former employee Belle Luna worked as a communication clerk from March 26, 1979 until she was released on July 11, 1980. During this time of employment she proved herself a good employee, she not only performed her duties of the 911 emergency line with excellent proficiency, but many times was called upon to act as detention officer (matron) in the female lock-up section of the Public Safety Building. She performed these duties so well that it was suggested she take the test for detention officer. She passed such examination and was promoted to detention officer on June 2, 1980."

## GOODWIN

Goodwin was employed by the city under CETA as a detention officer on September 26, 1977.

As of September 26, 1977 Goodwin was five feet five and one-half inches in height and weighed 190 pounds.

On May 21, 1980 the commission sent a letter to Goodwin, relative to her weight, the same as was sent to Luna except that the maximum weight for Goodwin was 165 pounds; Goodwin made the same acknowledgement and agreement as Luna; on May 21, 1980 Goodwin was given a physical examination by a city physician who noted her height to be 65½ inches and her weight 190 pounds; in all other aspects of the examination, she passed.

On May 24, 1980 Goodwin took the civil service examinaton for detention officer; on May 28, 1980 the commission wrote to the superintendent of the police department ". . . your nominee for the appointment to the position of detention officer, Department of Police, has passed the required examination of the Civil Service Commission and Miss Goodwin is eligible for appointment to the position of detention officer."

On June 2, 1980 Goodwin was employed as a detention officer in the department of police of the city.

Goodwin engaged in a supervised weight reduction program and did lose 12 pounds. On July 10, 1980 the commission advised Goodwin that due to her failure to report for weight monitoring, the commission would no longer certify her payroll effective July 11, 1980. After informal meetings with the commission, Goodwin continued on the payroll; however, on August 28, 1980 the commission wrote to Goodwin stating that since she did not meet the required weight on her weight reduction program as of August 27, 1980, the commission would discontinue certification of her payroll on August 28, 1980. Goodwin's employment with the city was terminated on August 28, 1980.

On July 23, 1980 Sergeant Leonard S. Puciata

and Sergeant John Palumbo, each wrote a letter as to Goodwin. Sergeant Puciata wrote: "For the last 24 months she has been under my direct supervision and has proven to be a reliable and trustworthy employee. She has always followed direction and her work was always more than satisfactory." Sergeant Palumbo wrote: "As administrative sergeant for the service branch, I have known Lorraine Goodwin since September 26, 1977. She has been one of our better employees (Detention Officer). She has always performed her duties very well and has proved herself a very good employee. . . ."

## MILLER

Prior to September 24, 1980, Miller, who was 33 years of age and six feet one inch in height and weighed 254 pounds, took the Civil Service examination for extra helper and extra driver in the sanitation department of the city. On September 24, 1980 the commission notified Miller by letter: "The following are your scores for the examinaton which you recently took, examination for extra driver. Scores: Helper part, passed; driving part, 86. Type of test performance. Dates of test helper part: September 12, 1980. Driving part: September 18 and September 19. Since you have passed both parts of this examination, your name has been placed on the eligibility for the positions of extra helper a/n, extra driver a/n[3]."

Miller reported to the commission for a physical examination on September 29, 1980; before being sent for a physical examination, he was weighed and found to be oveweight; as a result, he was

---

3. a/n—as needed.

neither interviewed or given the physical examination.

## CIVIL SERVICE COMMISSION

Rule III, Section 12(B)(2) of the commission relating to examination of applicants, provides: "Weight: Weight must conform with Metropolitan Life Insurance Company standards, plus or minus 10% and proportionate to body build. Failure to meet these standards will be disqualifying." The Metropolitan weight standards consist of two tables, one for men and one for women.

The weight standards do not apply to all civil service covered employes of the city but only to those civil service employes who are engaged in "arduous and non-sedentary" work. Although the commission submitted an incomplete list of 99[4] jobs which it classifies as "arduous and non-sedentary," detention officer was not included therein; however, the witness from the commission stated that the position of detention officer is considered "arduous and non-sedentary." The position sought by Miller appears on the list of 99.

The commission does not apply the minimum-maximum weight standard to all civil service covered employes in "arduous and non-sedentary" jobs on a continuous, periodic basis. The commission applies the minimum-maximum weight standard to "arduous and non-sedentary" positions in only three instances: (1) at the original hiring, (2) promotion, and (3) transfer. Once a person is employed in an "arduous-non-sedentary" civil serv-

---

4. The number of civil service-covered employes of the city engaged in "arduous and non-sedentary" work approximates 4,000.

ice covered position and if that person never applies for promotion or transfer, what that person weighs during their entire tenure of their original hiring does not jeopardize their job security.

The allowable weight range for Luna at five feet two inches is 97-152 pounds, for Goodwin at five feet five and one-half inches is 108-167 pounds, and for Miller at six feet one inch is 140-213 pounds.

The evidence establishes that Luna and Goodwin have proven themselves capable in fact of performing the duties of detention officer and that Miller is not incapable of performing the duties for the position for which he was examined and passed. We find that the only reason for the city's termination or denial of plaintiffs' employment was their failure to conform to the height and weight requirements established by the civil service commission. It is the validity of these height and weight requirements that we address herein.

At the outset of our discussion of the legal aspects of this case, we are best served by stating what this case is not. First, representative plaintiffs do not base their theory on a demand that the city provide equal employment opportunity to them as handicapped individuals, pursuant to the Rehabilitation Act of September 26, 1973, 87 Stat. 393, as amended, 29 U.S.C.A. §793, or the Pennsylvania Human Relations Act of October 27, 1955, P.L. 744, as amended, 43 P.S. §951. Second, we do not perceive this case as involving unlawful discrimination against any individuals or groups. Any employer, either governmental or private, may lawfully impose minimum and maximum weight and height requirements for its employes at least so long as these size limitations are rationally related to the efficient performance of the particular job in-

volved. Even those statutes prohibiting discrimination in employment against individuals because of race, sex, national origin, or religion, exempt height and weight requirements which have disproportionate impacts on certain protected groups, when these requirements fall under bona fide occupational qualification exceptions, that is, when there is a reasonable relation between the requirements and safe and efficient job performance. See, e.g., Title VII of the Civil Rights Act of July 2, 1964, 78 Stat. 253, as amended, 42 U.S.C.A. §2000e et seq.

When the government is an employer, its utilization of employment requirements is also restricted by the constitutional demands of equal protection of the laws. When employment rules exist, they must bear reasonable relation to the job performance sought and they must be applied equally: Cleveland Bd. of Education v. LaFleur, 414 U.S. 632 (1974); Parolisi v. Bd. of Examiners, 55 Misc. 2d 546, 285 N.Y.S. 2d 936 (1967); Blodgett v. Bd. of Trustees, 20 Cal. App. 3d 183, 97 Cal. Rep. 406 (1971).

In the present case, two factors are present which inpugn the rationality, job-relatedness, and fairness of the weight and height requirements for city employment. We find that these requirements, as applied to representative plaintiffs herein, are arbitrary and constitute an affront to the principles of equal protection demanded from government employers. The clarity of the rights of the representative plaintiffs compels us to grant their requested preliminary injunction.

As we have noted, the commission's weight and height requirements apply only to positions classified as "arduous and non-sedentary," and the

commission intended these requirements to relate to an individual's ability to perform the jobs so classified. However, no definition of the phrase "arduous and non-sedentary" has been offered the court, and no evidence factually relates the height and weight requirements to job capability. We cannot infer the mere listing together of positions demonstrates that similar physical capabilities are necessary for the safe and efficient performance of each job listed.

We do not doubt that some categories of employment positions listed on the incomplete "arduous and non-sedentary" list may require capabilities factually related to the body-size limitations adopted by the civil service commission in Rule III. However, it has not been shown satisfactorily that the size limitations relate reasonably to fitness for every listed position or to positions not listed, such as detention officers. As a result, we find the presumption of incapacity accorded to individuals not conforming to commission body-size standards to be arbitrary and capricious.

Furthermore, all height and weight requirements apply only to original hiring, transfer or promotion. City employes hired for "arduous, non-sedentary" positions, when conforming to height and weight requirements, may exceed those limitations without endangering their job security, despite the commission's virtuous defense of the inviolability of the requirements as related to performance ability. In truth, the height and weight requirements can bear no genuine factual relation to capability when they are not enforced throughout an individual's term of employment.

The law requires only the rational relationship of job requirements to the factual circumstances of

peformance of the particular job in question in order to sustain an application of those job requirements. In the present case, the apparent breach of this relationship creates a circumstance where plaintiffs' rights are clear. This is one of three elements typically required before a preliminary injunction will be issued. The other two elements are an urgent necessity to avoid injury which cannot be compensated in damages, and that greater harm would result by refusing the injunction than by granting it: AFSCME v. Shapp, 443 Pa. 527, 532-533, 280 A. 2d 375 (1971). These elements are present in this case. We recognize employment as a status granting not merely monetary rewards but also certain psychological and emotional benefits arising from the employed person's sense of well-being, contribution to community and family, and independence from the vagaries of gratuitous government largesse. The denial of these benefits creates a greater harm to representative plaintiffs, while granting them does not appreciably harm defendants.

## ORDER

And now, October 17, 1980, after hearing on representative plaintiffs' motion for a preliminary injunction, it is hereby ordered and decreed as follows:

1. That defendants are hereby enjoined from applying their height-weight standards to Belle Luna, Lorraine Goodwin and Ronald Miller.

2. Defendants are hereby directed to reinstate Belle Luna and Lorraine Goodwin to the positions of Detention Officers in the Department of Police of the City of Pittsburgh within five days from the date hereof.

3. The defendants are hereby directed to interview and give to Ronald Miller a physical examination within five days from the date hereof and if he passes the physical examination place him on the list for extra driver and extra helper as needed; the position of Ronald Miller shall be as it would have been as of September 29, 1980.

4. The assessment of damages, if any, and the application of the height-weight standard to all potential class members and the disposition of costs and attorneys fees shall be deferred until final hearing.

5. The representative plaintiffs are directed to either file a bond or cash in the amount of $500 with the Prothonotary of Allegheny County.

6. The effective dates herein shall begin upon the date the representative plaintiffs file the aforesaid bond or cash.